In the
United States Court of Appeals
For the Seventh Circuit

No. 98-4130

TAMYRA S. BOWERMAN,

Plaintiff-Appellee,

v.

WAL-MART STORES, INCORPORATED and
ASSOCIATES' HEALTH AND WELFARE PLAN,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 96 C 1380--Larry J. McKinney, Judge.

Argued September 24, 1999--Decided August 18, 2000

Before BAUER, RIPPLE and DIANE P. WOOD, Circuit
Judges.

RIPPLE, Circuit Judge.  From October 1993 until
July 1995, and then from August 1995 until
September 1996, Tamyra Bowerman was employed by
Wal-Mart Stores, Inc. ("Wal-Mart"). As a full-
time employee of Wal-Mart, Ms. Bowerman was
entitled to participate in a Wal-Mart-sponsored
and -maintained employee welfare benefit plan
called the Wal-Mart Stores, Inc. Associates'
Health and Welfare Plan ("the Plan"). While she
was employed at Wal-Mart, Ms. Bowerman elected to
obtain her medical insurance coverage through the
Plan.

The present lawsuit between Ms. Bowerman and
Wal-Mart stems from the Plan's decision not to
pay nearly $12,000 in medical expenses related to
Ms. Bowerman's pregnancy. Ms. Bowerman contends
that the Plan should have paid these expenses.
The Plan concedes that expenses incurred due to a
pregnancy ordinarily would be covered by the
Plan. Nevertheless, the Plan maintains that,
because of the one-month hiatus in her employment
at Wal-Mart in 1995, Ms. Bowerman's pregnancy
must be treated as a pre-existing condition that
the terms of the Plan exclude from coverage.

Ms. Bowerman brought this suit under the civil
enforcement provision of the Employment

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. sec. 1132. After a bench trial, the district court rendered a decision for Ms. Bowerman and ordered Wal-Mart to cover Ms. Bowerman's pregnancy-related claims. The court further ordered Wal-Mart to improve its explanations in its plan documents, and it awarded Ms. Bowerman attorneys' fees. For the reasons set forth in the following opinion, we affirm, as modified, the judgment of the district court.

I
BACKGROUND
A.  The Wal-Mart Plan

   The Wal-Mart Plan is a single-employer, unfunded plan governed by ERISA. Eligible Wal-Mart employees may participate in the Plan's medical benefit program. The Plan's Administrative Committee (the "Administrator") acts as its administrator and fiduciary, and, according to the terms of the Plan, the Administrator has discretionary authority "to resolve all questions concerning the administration, interpretation, or application of the Plan." R.28, Ex.1 (1995 SPD) at Q-2. Furthermore, the Administrator has the sole power to amend the terms of the Plan, and all amendments must be made in writing.

   These aspects of the Plan, along with other important Plan provisions, are explained in the annual Associate Benefit Book, also known as the Summary Plan Description ("SPD"). Each newly-hired employee receives a copy of the then-current SPD, and, thereafter, Wal-Mart's annual distribution of new SPDs to each employee coincides with the effective date for the SPDs. The relevant SPD for this litigation is the 1995 SPD. The 1995 SPD directed Plan participants who had questions regarding their benefits to contact a Plan service representative at designated telephone numbers.

   At all times relevant to this litigation, and as explained in the 1995 SPD, the Wal-Mart Plan subjected new full-time employees to a 90-day waiting period before they were eligible for benefits. Furthermore, newly-hired employees could not obtain benefits for charges related to "pre-existing conditions" until the new employees had been covered by the Plan for 12 consecutive months./1 When employees ended their employment at Wal-Mart, they would lose their Plan benefits on the last day they worked./2

   For those Plan participants who became ineligible for benefits because their employment had been terminated, the Plan's 1995 SPD informed them that they could obtain continuation of

coverage as provided under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. sec. 1161 et seq. According to the 1995 SPD, a participant had 60 days from the date the COBRA notification form was mailed to the employee to elect COBRA coverage. The 1995 SPD explained to participants that, if they chose COBRA coverage, they could continue that coverage for up to 18 months. Additionally, the 1995 SPD explained that COBRA coverage would terminate upon the occurrence of certain events, one of which was a participant's failure to pay the premium within 30 days of its due date.

In addition to these rather standard plan attributes, the Wal-Mart Plan had a distinctive feature. When employees of Wal-Mart terminated their employment but then returned to work for the company within 12 months, the Administrator had a policy of allowing the returning employees to immediately "return" to the same medical coverage that they had had before leaving the company. The Plan's 1995 SPD explained this feature of the Plan to Wal-Mart employees in these terms:

If you are rehired, reinstated to full-time employment, or are cancelled for non-payment of premiums, and you return to work in less than 12 months from the end of coverage, you will automatically receive the same benefits you had before. You will not have a 90-day wait for benefits, but pre-existing condition limitations will apply.

R.28, Ex.1 (1995 SPD) at C-3. Under this provision, the Administrator would ignore the interruption in employment, and the rehired employees would not be subjected to the 90-day waiting period for coverage to begin. For purposes of the pre-existing condition limitation, however, the Plan would not overlook the interruption in employment; the Plan would apply the year-long pre-existing condition limitation against rehired employees who had a break in their coverage under the Plan. Notably, however, the 1995 SPD never informed the employees that fully paid COBRA coverage would constitute continuous coverage and thus obviate the 12 month pre-existing condition limitation.

B. Facts

Ms. Bowerman enrolled in the Wal-Mart Plan when she began working at the Wal-Mart Photo Lab in Crawfordsville, Indiana, in October 1993. As a newly-hired employee, Ms. Bowerman was subject to the Plan's 90-day waiting period for medical benefits. Ms. Bowerman's medical coverage under the Plan became effective on January 11, 1994.

She was also subject to the Plan's pre-existing condition limitation.

On July 20, 1995, Ms. Bowerman quit her job at Wal-Mart in order to take another position with a different company. During her exit interview, Ms. Bowerman obtained information about continuing her medical coverage by electing COBRA coverage, and, either at the exit interview or shortly thereafter, Ms. Bowerman also received a "NOTICE OF RIGHT TO CONTINUE COVERAGE (COBRA)" and a COBRA enrollment form from Wal-Mart. Dist. Ct. R. Stipulated Ex.2 at 10. The COBRA notice was written in a question and answer format, and stated in part:

When do you pay for the coverage? PLEASE DO NOT SEND A PAYMENT NOW!!
If you elect coverage, you will owe premiums back to your qualifying event date. Once you have been enrolled, we will mail you a payment book to submit payments by. Your first payment will bill you from your event date through the month in which we enroll you for COBRA. IT COULD BE MORE THAN ONE MONTHS PREMIUM! This payment will be due 45 days from the due date shown on your payment book. Every month thereafter you will make your normal monthly payment which is due on the first of each month. . . .

Id. The notice also stated that COBRA coverage would end "[t]he first day for which timely payment is not made to the Plan." Id. The 1995 SPD provided that COBRA coverage would be terminated if the COBRA premium was not paid within 30 days of the due date.

At the time she quit her job at Wal-Mart on July 20, Ms. Bowerman was unaware that she was nearly one month pregnant. Later, on August 8, Ms. Bowerman went to her physician's office to have a pregnancy test performed. A medical technician administered a test similar to a home pregnancy test, and, from the results of this test, Ms. Bowerman learned that she was pregnant. Ms. Bowerman never saw her physician during this visit to his office, but the results of her pregnancy test were placed in her medical file. The district court specifically found that the test administered to her could have been conducted at home without the assistance of a medical provider, and if the test had been self-administered, the pregnancy would not have been considered a pre-existing condition under the Plan.

A few days after having the pregnancy test performed, Ms. Bowerman filled out her COBRA enrollment form and later mailed it into the Plan's COBRA department. The Plan received the form on August 23 and then generated a coupon

book for Ms. Bowerman's payments.

Because she found her new job to be more strenuous than her job at Wal-Mart, Ms. Bowerman returned to the Wal-Mart Photo Lab on August 14, 1995, and asked to be rehired. She also informed the employees at the Photo Lab that she was pregnant. Her former boss rehired her on the spot, but, because Ms. Bowerman had been feeling ill that week, they both decided she should wait until the following Sunday to start work. On August 20, 1995, Ms. Bowerman began working at Wal-Mart again, and this date became her official rehire date.

When Ms. Bowerman returned to work at Wal-Mart on August 20, her need for COBRA coverage ended because, as an employee who returned to the company within 12 months, Ms. Bowerman could take advantage of the Administrator's special rehire policy. On August 20, the day Ms. Bowerman began working again for Wal-Mart, the Plan immediately restored her medical coverage and resumed deducting medical benefit premiums from Ms. Bowerman's paycheck. Because there had been such a short interval since her prior employment with Wal-Mart, the payment for her COBRA coverage was not yet due; indeed, Ms. Bowerman had not yet received the coupon book by which she was to make payments. Her first COBRA premium would have been due on October 9, 1995. Although October 9 was the due date, if the 1995 SPD's 30-day grace period for paying COBRA premiums is applied to that due date, the very last date on which Ms. Bowerman could have paid her premium and obtained her COBRA coverage would have been November 8, 1995.

A few days after returning to Wal-Mart, Ms. Bowerman met with Chuck Spencer, who was an administrative assistant at the Photo Lab and who was responsible for administering benefit plan enrollment for that department. Ms. Bowerman recounts their conversation as follows:
And I [Bowerman] don't know if I asked him [Spencer] if I had to wait my 90 days until my insurance was picked up. I am not sure. And he told me because I returned to Wal-Mart within the same calendar year that my regular insurance would be picked back up the day I came back to work on August 20th. And I asked him, so I don't need my COBRA, and he told me no. Because I didn't want to be making COBRA payments and already have my regular insurance.
R.78 at 5-6. After her conversation with Spencer, Ms. Bowerman apparently believed that she did not need COBRA coverage. On or about September 17, 1995, Ms. Bowerman executed a "DISCONTINUE COVERAGE(S) FORM" from her COBRA coupon book and mailed that form to the Plan's COBRA department.

Id. at 6. Ms. Bowerman indicated on the form that her reason for discontinuing COBRA coverage was that: "I went back to work at Wal-Mart so my insurance is still in effect." Id. Ms. Bowerman never made the COBRA premium payment that was due on October 9. Nobody from the Plan contacted Ms. Bowerman to follow up on her decision to decline COBRA coverage./3 Nor is there any indication in the record that she ever received a prorated bill for the actual period during which she was not employed by Wal-Mart and therefore dependent upon COBRA for coverage. According to the district court's findings, Ms. Bowerman received no response to the comment she placed on the form. The district court also noted that Ms. Bowerman assumed that any payments that she owed were being deducted from her paycheck.

Ms. Bowerman received pregnancy-related treatment on several occasions after she had returned to work at Wal-Mart on August 20. Consequently, in September, Ms. Bowerman's medical providers began submitting claims for medical services related to her pregnancy. The Plan did not pay those claims. When Ms. Bowerman was admitted to the hospital on October 9 for a pregnancy-related incident, a hospital employee called the Plan to verify coverage for Ms. Bowerman. A Plan service representative told the hospital employee that Ms. Bowerman had coverage with an effective date of January 11, 1994 (the date Ms. Bowerman's coverage first became effective after Wal-Mart initially had hired her). Nevertheless, when the hospital later submitted its claim, it went unpaid by the Plan.

Over the course of the next several weeks and months, Ms. Bowerman and her health providers repeatedly contacted the Plan to determine why claims were not being paid./4 They received varying answers in their inquiries. First, as we have already mentioned, the Plan explained to the hospital employee that Ms. Bowerman had coverage with an effective date of January 11, 1994. Then, on October 24, 1995, an employee of Ms. Bowerman's physician called the Plan to obtain an explanation for why the Plan had denied a claim submitted by that office./5 The following is part of the conversation between the doctor's employee and the Plan's service representative:

REP:. . . You just wanted to know about what happened with the claim?

CALLER:Well, it shows that, that uh, her coverage or it says coverage has been terminated on 07-20 of 95 and I had went through your system, oh I don't know, (inaudible). But I gathered an effective date of 08-20 of 95. Which is before the date of service on my claim.

REP:O.K. Hold on one moment and let me check the eligibility for you.

CALLER:O.K.

REP:O.K. I'm showing that regular medical coverage ended as of 07-20 and they picked up COBRA . . .

CALLER:Uh-huh.

REP:Or were going to pick it up as of 7-21, it didn't . . .

CALLER:O.K.

REP:So coverage actually ended on 07-21.
CALLER:O.K. So she does not have COBRA coverage?

REP:No m'aam [sic].

CALLER:O.K.

REP:Looks like she had signed up and was going . . . and then it looks like she was gonna take it and something happened and she didn't.

Dist. Ct. R. Group Ex.1. The next day, October 25, 1995, Ms. Bowerman herself called the appropriate Plan service center in an effort to determine why her pregnancy-related claims were not being paid by the Plan. The following is the conversation that Ms. Bowerman had with one of the Plan's service representatives:

REP:How may I help you?

CALLER:Well, I, I just talked to someone and she said the reason my bills aren't being paid is cause you guys don't have me down as insurance, but it's not. Cause I quit and had the COBRA and then I went back to work in like less than a month so my insurance picked back up and she said that she didn't find that it, so when I, I picked my insurance back up.

REP:OK, I shown you did on August 20th.

CALLER:Right, that's when I, yeah, that's when I went back to work. So I want to know why all these bills I'm getting are not being covered. If I have insurance, why aren't they being covered?

REP:OK, just a moment. Let me go to the claims screen. Just a second. So you agree that your effective date should be 8-20.

CALLER:Yeah.

REP:OK.

CALLER:That's when I went back, yeah.

REP:Great.

CALLER:I was just gone for like a month or so . . .

REP:OK, what I can do, what they need to do is we need to update the system.

CALLER:Um-hum.

REP:And, reconsider the three charges that we have, that was for August.

CALLER:What do you mean reconsider?

REP:Well, I'll send them back over.

CALLER:Oh, OK.

REP:To be processed.

CALLER:Oh.

REP:OK?

CALLER:OK. Well I was just wondering cause my doctor's been calling and . . . .

REP:I, I show that the provider has called this morning already.

CALLER:OK.

REP:So I will, I will get this fixed for you. OK?

CALLER:OK, I appreciate it.

REP:OK. Have a nice day.

CALLER:OK, you too.

Id.

Also in October 1995, the Plan generated statements called "Explanations of Benefits" ("EOBs"), which were sent to Ms. Bowerman in response to the claims submitted by her health care providers. The EOBs generated in October 1995--one generated on October 10 and two generated on October 16--stated that the claims had been denied because the Plan's records "indicate[d] that no coverage was selected." R.78 at 10. One of the October 16 EOBs also indicated that the claim had been denied because Ms. Bowerman's "coverage ha[d] been terminated." Id.

Over the course of the next few months, Ms. Bowerman contacted the Plan on a number of other occasions in an effort to determine why the Plan was not covering her claims. It was not until a January 22, 1996, telephone call, however, that Ms. Bowerman first became aware that her claims might be denied because they related to her pregnancy. During this telephone call, a Plan representative revealed that the Plan was reviewing whether Ms. Bowerman's pregnancy was a pre-existing condition that would not be covered.

In the next few months, the Plan conducted its pre-existing condition investigation, which lasted until March 1996. On March 18, Ms. Bowerman learned for certain from a Plan representative that her pregnancy-related claims would not be paid and that the Plan considered her pregnancy to be a pre-existing condition. Her pregnancy was a pre-existing condition, Ms. Bowerman was told, because the original pregnancy test performed on August 8, 1995, had been documented in her medical file. Ms. Bowerman's failure to pay for COBRA coverage for the time between July 20 and August 20, the representative explained, meant that her coverage had lapsed and that she was subject to a new pre-existing condition limitation.

When Ms. Bowerman tried to explain that she had elected COBRA but then had returned to work so that her "insurance was never dropped," the representative explained to Ms. Bowerman that she still would have had to "pick up" COBRA coverage for the interim period in order to avoid the pre-existing condition limitation. R.78 at 9. At no time before this did a Plan representative explain to Ms. Bowerman that she would be without insurance coverage for the period between July 20 and August 20 if she did not pay her COBRA premium. Also, until this conversation in March 1996, no one from the Plan had explained to her that the failure to pay her COBRA premium would cause a "break" in coverage and that the break would cause her to be subject to a new pre-existing condition limitation period.

Unable to obtain from the Plan the medical costs of her pregnancy, Ms. Bowerman filed this ERISA lawsuit against Wal-Mart on September 25, 1996. In her complaint, Ms. Bowerman alleged that Wal-Mart, through its Plan, wrongfully denied her coverage in violation of 29 U.S.C. sec. 1133 and that she was therefore entitled to recover those benefits pursuant to 29 U.S.C. sec. 1132(a)(1)(B). Ms. Bowerman alternatively alleged that Wal-Mart breached its fiduciary duties under ERISA by not timely informing her of the consequences of failing to elect COBRA coverage

for the time she was not working at Wal-Mart. Ms. Bowerman sought damages in the amount of her pregnancy-related expenses that would have otherwise been covered by the Plan. She also sought attorneys' fees, costs, punitive damages, and all other necessary and appropriate relief.

## C. Decision of the District Court

The district court conducted a bench trial, and the court later issued its findings of fact and memorandum of law.

### 1. Claim for Personal Benefits

The district court first addressed Ms. Bowerman's contention that she was entitled to have the Plan cover her pregnancy-related expenses.

The district court concluded that the Plan documents adequately alerted Ms. Bowerman to the possibility that a pre-existing condition limitation might apply to her when she returned to work at Wal-Mart. The court noted that the relevant SPD provided that returning employees would not have a 90-day wait for benefits, "but pre-existing condition limitations will apply." R.78 at 19. Moreover, the district court explained, Ms. Bowerman's pregnancy undoubtedly qualified as a pre-existing condition under the Plan's terms.

Nevertheless, the district court explained, it was not dispositive that the Plan had warned participants that the pre-existing condition limitation might apply to them. Rather, the Plan's explanation was not sufficient, according to the district court, because the Plan's documents contained no description of how COBRA coverage would "bridge the gap" and thereby prevent the pre-existing condition limitation from applying to a returning employee. In "ordinary circumstances," continued the court, Ms. Bowerman would be responsible for the gap in her coverage because she failed to pay the COBRA premium. Id. at 21. The circumstances here, however, were not ordinary. The Plan's special re-hire policy for those who had left Wal-Mart's employ within the past year created an acute need for the Plan to provide additional information to employees about how COBRA coverage would "bridge the gap" between their regular coverage and would allow the returning employee to avoid a new pre-existing condition limitation. When employees returned after a short time away from the company, as Ms. Bowerman did, the court explained that those employees especially needed timely and accurate information about their status under the plan.

The Plan's failure to provide the needed information to Ms. Bowerman, however, did not end with its SPD, according to the district court. Rather, "the combination of an SPD that says nothing about bridging a gap in coverage with COBRA to avoid pre-existing condition limitations, the advice given by Spencer, and all of the other circumstances taken together, [including the advice of the Plan's employees who answered telephonic inquiries,] constituted materially misleading information, on which [Ms.] Bowerman reasonably relied." Id. at 28. These circumstances, according to the district court, "lulled" Ms. Bowerman into a false impression about her medical coverage for that one-month period she did not work at Wal-Mart. Id. at 29. As the district court explained, "[u]nder these circumstances, Spencer's representation misled [Ms.] Bowerman to the point where she could not be expected to ask the customer service representatives the right questions about her coverage." Id. at 28. At the time, continued the court, it was not clear to Ms. Bowerman that the COBRA premium was a separate matter from her renewed coverage. Nor was it clear to her that her return to work would not prevent a break in coverage if she failed to elect and to pay for COBRA coverage for the time between July 20 and August 20. Therefore, the district court reasoned, Ms. Bowerman was entitled to rely on an estoppel theory to recover her benefits from the Plan.

In reaching this conclusion, the district court indicated that it was aware of the rule forbidding oral modifications of substantive plan provisions. Rather, it characterized the oral representations made to Ms. Bowerman by Spencer and by the Plan's service representatives as the Plan Administrator's "discretionary application" of the Plan. Id. at 25. Moreover, although Spencer did not work for the Administrator and was not mentioned in the SPD as a source of authoritative information about the Plan, the district court concluded that the Administrator had clothed Spencer with sufficient apparent authority to make the Plan accountable for his representation.

To prevail on an estoppel theory, the district court explained, Ms. Bowerman had to show that the Plan had made a misleading representation, that she had reasonably relied on that misrepresentation, and that her reliance was detrimental. As to the first element, it was clear to the district court that the Plan had made misleading representations to Ms. Bowerman. The 1995 SPD, along with Spencer's answers and the service representatives' explanations, all

amounted to a misleading representation, according to the district court, because none of them explained to Ms. Bowerman the relationship between COBRA and the pre-existing condition limitation in the context of the Plan's special rehire policy.

The court also found that Ms. Bowerman's reliance on those misleading representations was reasonable. Specifically, the district court explained that Ms. Bowerman reasonably had relied on Spencer's statement that she did not need COBRA coverage. Her reliance was justified, according to the district court, because Ms. Bowerman had no reason to doubt Spencer's authority to explain the provisions of the Plan.

Finally, the district court found that Ms. Bowerman had been adversely affected by her reliance: She did not make her COBRA premium payment because she believed that she did not need it once she returned to work at the Photo Lab. By not making the COBRA payment, Ms. Bowerman incurred thousands of dollars in medical expenses related to her pregnancy, which the Plan refused to pay.

Because the requisites for applying estoppel were present in this case, the district court held that the Plan should be estopped from denying coverage for Ms. Bowerman's pregnancy-related expenses. The court ordered Wal-Mart to accept from Ms. Bowerman the COBRA premium payment she should have paid in October 1995. The court ordered that, once that payment had been made, the Plan had to pay Ms. Bowerman the benefits that she would have received had there been no gap in her coverage.

2.  Breach of Fiduciary Duty

Even though the court held that Ms. Bowerman was entitled to estop the Plan from denying her benefits, the district court also addressed Ms. Bowerman's claim that the Plan breached its fiduciary duty to her. Because an ERISA claim for breach of fiduciary duty can be brought only against an individual or entity that acts as a plan fiduciary, the district court first determined which parties might exercise discretion over the Plan so as to qualify as fiduciaries of the Wal-Mart Plan. According to the district court, Spencer and the service representatives did not exercise the necessary degree of discretion to expose them to fiduciary liability under ERISA. The district court did conclude, however, that the Administrator qualified as a fiduciary. Moreover, the district court concluded that the Administrator had breached its fiduciary duty to Ms. Bowerman

because of the Plan's failure to explain fully how paid-up coverage under COBRA would affect the pre-existing condition limitation for individuals rehired with only a short break in service. The district court further reasoned that the combination of the inadequate explanation of the policy in the Plan documents along with the misinformation provided by Spencer and the service representatives amounted to a breach of fiduciary duty by the Administrator.

Finally, the district court concluded that this breach of fiduciary duty entitled Ms. Bowerman to Plan-wide equitable relief. The court held that Ms. Bowerman was entitled to an injunction requiring Wal-Mart to provide a more accurate and comprehensive explanation of the relationship between the Plan's pre-existing condition limitation and continuing coverage under COBRA. Additionally, the court's injunction required Wal-Mart to provide an explanation of how COBRA coverage could "bridge the gap" for employees rehired by Wal-Mart within one year.

3. Attorneys' Fees

In light of its holding entitling Ms. Bowerman to her benefits and to injunctive relief, the district court also considered Ms. Bowerman's request for attorneys' fees under ERISA. The district court concluded that it could employ one of two tests for determining whether attorneys' fees were appropriate in this case. According to the district court, under one test it would ask whether Wal-Mart's position had been "substantially justified." R.78 at 38. Under the other test, the court explained, it would weigh five factors: "1) the degree of [Wal-Mart's] culpability or bad faith; 2) the ability of [Wal-Mart] to satisfy personally an award of attorneys' fees; 3) whether or not an award of attorneys' fees would deter other persons acting under similar circumstances; 4) the amount of benefit conferred on participants of the plan as a whole by the litigation; and 5) the relative merits of the parties' positions." Id. The district court also noted that there was a "modest presumption" for awarding fees in favor of the prevailing party, especially in cases where that party is a plan beneficiary or participant. Id.

Although the district court rejected Ms. Bowerman's assertion that Wal-Mart had acted in bad faith, the court held that a fee award nevertheless was appropriate in this case. The district court came to this conclusion in part because of the modest presumption in favor of awarding fees to prevailing parties when the prevailing party is the plan participant or

beneficiary and because, despite this presumption, Wal-Mart had not made an argument or presented evidence to oppose a fee award.

The district court noted that, regardless of the test employed, "the bottom-line question is essentially the same: was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" Id. at 39. In this case, the district court explained, Wal-Mart's position was not substantially justified. Thus, after taking into consideration the modest presumption favoring an award to Ms. Bowerman, Wal-Mart's response to her request, and Wal-Mart's unjustified position, along with the remedial purpose of ERISA, the district court ruled that Ms. Bowerman was entitled to reasonable attorneys' fees and costs./6

II
DISCUSSION

Because this case comes to us after the district court conducted a bench trial, we review the district court's factual findings for clear error, see Petrilli v. Drechsel, 94 F.3d 325, 329 (7th Cir. 1996), and the court's legal conclusions de novo, see Ross v. Indiana State Teacher's Ass'n Ins. Trust, 159 F.3d 1001, 1008 (7th Cir. 1998), cert. denied, 525 U.S. 1177 (1999); Petrilli, 94 F.3d at 329./7

A.  Equitable Estoppel
1.

The district court correctly held that Wal-Mart should be estopped from denying coverage for Ms. Bowerman's pregnancy-related expenses. We have held that "estoppel principles are applicable to claims for benefits under unfunded single-employer welfare benefit plans under ERISA." Black v. TIC Inv. Corp., 900 F.2d 112, 115 (7th Cir. 1990); see also Miller v. Taylor Insulation Co., 39 F.3d 755, 758 (7th Cir. 1994). We have emphasized on several occasions, however, that the availability of estoppel in the ERISA context is constrained by other important considerations animating ERISA. Most notably, we have stressed repeatedly that equitable estoppel cannot dilute the rule forbidding oral modifications to an ERISA plan. See Coker v. Trans World Airlines, Inc., 165 F.3d 579, 585 (7th Cir. 1999); Frahm v. Equitable Life Assurance Soc'y of the U.S., 137 F.3d 955, 961 (7th Cir. 1998), cert. denied, 525 U.S. 817 (1998); Schmidt v. Sheet Metal Workers' Nat'l Pension Fund, 128 F.3d 541, 546 (7th Cir. 1997), cert. denied, 523 U.S. 1073 (1998)./8 We simply have rejected the claim that "bad advice delivered verbally entitles plan participants to

whatever the oral statement promised, when written documents provide accurate information." Frahm, 137 F.3d at 961.

Nevertheless, despite these important restrictions, we have applied estoppel principles when countervailing ERISA principles would not be impeded and "one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation." Gallegos v. Mount Sinai Med. Ctr., 210 F.3d 803, 811 (7th Cir. 2000), petition for cert. filed, 69 U.S.L.W. 3003 (U.S. June 27, 2000) (No. 99-2083). As the court recently explained in Gallegos, the "basic policy consideration arguing in favor of applying estoppel is the principle of contract law that 'a party who prevents the occurrence of a condition precedent may not stand on that condition's non-occurrence to refuse to perform his part of the contract.'" Id. at 809 (quoting Swaback v. American Info. Techs. Corp., 103 F.3d 535, 542 (7th Cir. 1996)). In Gallegos, the court noted that we have applied estoppel principles to ERISA claims "where the claimant was misled by written representations of the insurer or plan administrator into failing to take an action that would have enabled the claimant to receive benefits under the Plan." Id. We further noted that estoppel is appropriate in an ERISA action "where the defendant insurer misrepresented the contractual limitations period in the plan summary" because "'a defendant whose own activities made the plaintiff miss the deadline should not be allowed to litigate over whether the plaintiff could have sued earlier.'" Id. at 809 (quoting Doe v. Blue Cross & Blue Shield United of Wisc., 112 F.3d 869, 876 (7th Cir. 1997))./9 Furthermore, in Swaback we held that when an employer has provided "repeated misinformation" to an ERISA claimant, and that misinformation prevented the claimant from making an election of benefits, estoppel should be applied to prevent the employer from denying those benefits to the claimant. 103 F.3d at 542-43.

2.

We now turn to an examination of the Plan documents to ascertain whether the record will support the conclusion that Ms. Bowerman was misled into believing that she need not pay her COBRA premium for the time she was not employed by Wal-Mart in order to avoid the pre-existing condition limitation. We think that the district court was on solid ground in deciding that the 1995 SPD and the other Plan documents insufficiently explained the need for employees like Ms. Bowerman, who were rehired by Wal-Mart after a brief hiatus, to obtain COBRA coverage

through the Plan.

An ERISA plan's SPDs must be written "in a manner calculated to be understood by the average plan participant, and [be] sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. sec. 1022(a). The SPD must include, among other things, information about "the plan's requirements respecting eligibility for participation and benefits" as well as information regarding the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." Id. sec. 1022(b). When we interpret ERISA plan SPDs, we interpret them according to their plain meaning as understood by an average person. See Gallegos, 210 F.3d at 810.

The district court believed that the Plan's 1995 SPD adequately disclosed that, upon rehire, employees would be subject to a pre-existing condition limitation. Nevertheless, we agree with the district court that the Plan documents never explain adequately that this pre-existing condition limitation period is not applicable to individuals who leave Wal-Mart's employ for a short period, elect COBRA coverage, and pay the premium due for that period. Given Wal-Mart's policy of immediately reinstating the health benefits of individuals who rejoin the company after a short interval, the absence of this information gives those employees an inaccurate view of their coverage. We believe that the explanations provided in the SPD, as well as the COBRA-specific information provided to Ms. Bowerman after she left Wal-Mart's employ, did not provide the critical information needed by employees in her circumstances--circumstances, it must be remembered, that were created by Wal-Mart's policy on the reinstatement of medical benefits for rehired employees. Merely informing Ms. Bowerman that she might be subject to that pre-existing condition limitation did not sufficiently inform her of the importance of maintaining COBRA coverage after her separation from Wal-Mart in order to avoid a new pre-existing condition limitation when she was rehired.

We must conclude that, as applied to employees in Ms. Bowerman's circumstances, the 1995 SPD lacked the clarity and completeness required by sec. 1022. Having failed to provide Ms. Bowerman with an adequate explanation in its Plan documents, we believe that the Plan cannot now rely on its interpretation of those documents to deny coverage to Ms. Bowerman.

3.

The appropriateness of applying estoppel in this case becomes even more clear when we take into consideration, as did the district court, that the Plan, through its own actions, reinforced the confusion created by its own documents and consequently prevented Ms. Bowerman from paying the COBRA premium that would have "bridged the gap" between July 20 and August 20.

We have made clear in our earlier cases that the oral representations of an ERISA plan may not be relied upon by a plan participant when the representation is contrary to the written terms of the plan and those terms are set forth clearly. See Plumb v. Fluid Pump Serv., Inc., 124 F.3d 849, 856 (7th Cir. 1997); Vershaw v. Northwestern Nat'l Life Ins. Co., 979 F.2d 557, 559 (7th Cir. 1992); Pohl, 956 F.2d at 128. Here, that rule is not applicable because the Wal-Mart Plan documents are not free from ambiguity; indeed, they leave the employee in Ms. Bowerman's situation guessing as to the appropriate course of action. Faced with similar circumstances, our colleagues in other circuits have held that estoppel is permissible when the ERISA plan has supplied ambiguous documentation and the participant is further misled by the statements of the Plan's agents. In its en banc opinion in Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir.) (en banc), cert. denied, 524 U.S. 923 (1998), the Court of Appeals for the Sixth Circuit held that, although principles of estoppel can never be applied to vary the terms of an unambiguous plan document, estoppel may be invoked in the case of ambiguous plan provisions. Id. at 404. Estoppel, reasoned the court, requires reasonable or justifiable reliance by the party asserting estoppel. That party's reliance, continued the court, can seldom, if ever, be justifiable when it is inconsistent with plan documents that are unambiguous and clear. Allowing estoppel when the documents are clear, moreover, would be inconsistent with the purpose of ERISA. See id.; Fink v. Union Cent. Life Ins. Co., 94 F.3d 489, 492 (8th Cir. 1996) (holding that written and oral misrepresentations could not serve as a basis of estoppel when the plan documents were clear); see also Frahm, 137 F.3d at 961 ("In federal law, a person cannot rely on an oral statement, when he has in hand written materials disclosing the truth."). By contrast, in Kane v. Aetna Life Insurance, 893 F.2d 1283 (11th Cir. 1990), the Court of Appeals for the Eleventh Circuit explicitly held that, when the plan documents are ambiguous, the oral interpretations of authorized plan employees may be the basis for an estoppel because allowing estoppel under such circumstances does not

undermine the policies of ERISA. See 893 F.2d at 1285-86; see also Alday v. Container Corp. of Am., 906 F.2d 660, 666 (11th Cir. 1990) (reaffirming the holding in Kane). The Ninth Circuit has adopted explicitly the rationale of the Eleventh Circuit. See Greany v. Western Farm Bureau Life Ins. Co., 973 F.2d 812, 821-22 (9th Cir. 1992)./10

Here, the district court made an explicit finding of fact that the Plan had clothed Spencer, the administrative employee who handled employee enrollments for Ms. Bowerman's department, with sufficient indicia of "apparent authority" to make it reasonable for her to rely on his pointed statement that she did not need COBRA coverage. R.78 at 31-32. Although we must accept this finding of fact from the district court unless the finding is clearly erroneous, we approach this particular finding with great circumspection. The Plan documents state unequivocally that inquiries concerning the Plan are to be addressed to a representative of the Plan at a stated toll-free number. There is considerable force to the argument that, given the clarity of this particular direction, it was not reasonable for Ms. Bowerman to seek advice elsewhere. On the other hand, the Plan documents do not state that this toll- free number ought to be the sole source of information and, in the context of a single-employer welfare benefit plan administered by the employer, we cannot say that the district court erred by taking into account Spencer's misstatements./11

In any event, the district court's finding cannot be, on this record, reversible error because it is clear that Ms. Bowerman did indeed inquire of the Plan service representative available through the toll-free number. Indeed, it was the representation of this service representative that caused Ms. Bowerman to have the fatal break in her coverage. Not understanding why her claims were being denied by the Plan, Ms. Bowerman telephoned the Plan service representative, as instructed by the 1995 SPD, to obtain answers related to her medical benefits. Ms. Bowerman explained her situation to the Plan's service representative, and she was told that the representative would "get this fixed" for her. Dist. Ct. R. Group Ex.1. The Plan now asserts that Ms. Bowerman's pregnancy should be treated as a pre-existing condition because she failed to pay her COBRA premium. But Ms. Bowerman could have paid her premium at the time she called the Plan on October 25--or even as late as November 8--and still made a timely payment for her COBRA coverage.

As the district court found, "[t]he reason she did not make that COBRA premium payment was that she did not want to be making double premium payments after she returned to work, and she understood from talking with Spencer that she would not need COBRA coverage." R.78 at 7. The Plan documents failed to address Ms. Bowerman's need to pay her COBRA premium in order to avoid the pre-existing condition limitation. "Had [Ms. Bowerman] known that payment of that premium would have enabled her to avoid any pre-existing condition problems with her pregnancy," the district court found, "she would have paid it." Id. at 29. Not only did the Plan documents fail to address Ms. Bowerman's situation, a situation faced by all individuals who are re-employed after a short break in service, but the Plan's representative frustrated any possibility that Ms. Bowerman would pay that COBRA premium. When Ms. Bowerman squarely presented her situation to the Plan's service representative, that representative, rather than providing the crucial information she needed, essentially told Ms. Bowerman that nothing more needed to be done. But for the Plan's misleading and incomplete information, Ms. Bowerman would have paid her COBRA premium on time.

Accordingly, we affirm the district court's determination that Ms. Bowerman is entitled to assert equitable estoppel in these circumstances. We also approve of the remedy fashioned by the district court.

B.   Breach of Fiduciary Duty
1.

The district court also ruled that the Plan had breached its fiduciary duty to Ms. Bowerman. The district court held that the Plan's Administrator, as the Plan's fiduciary, had breached its fiduciary duty to Ms. Bowerman because of its failure to explain fully in the Plan documents the operation of the rehire policy vis-a-vis COBRA coverage and the pre-existing condition limitation. Noting that neither Spencer nor the Plan's service representatives could be considered fiduciaries, the district court nevertheless observed that the misstatements of these individuals had harmed Ms. Bowerman because the Plan documents afforded her no accurate information on the issues upon which these individuals had given her erroneous information. We agree with the district court's assessment.

To be a fiduciary of an ERISA plan, an individual or entity "must exercise a degree of discretion over the management of the plan or its assets, or over the administration of the plan itself." Schmidt, 128 F.3d at 547. Here, the Plan's Administrator undoubtedly is a fiduciary

of the Plan. Under ERISA, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. sec. 1104(a)(1). Fiduciaries breach this duty "if they mislead plan participants or misrepresent the terms or administration of a plan." Anweiler v. American Elec. Power Serv. Corp., 3 F.3d 986, 991 (7th Cir. 1993); accord Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452-53 (3d Cir. 2000); Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 547-48 (6th Cir. 1999); Eddy v. Colonial Life Ins. Co. of Am., 919 F.2d 747, 750 (D.C. Cir. 1990). Although not every error in communicating information regarding a plan will be found to violate a fiduciary's duty under ERISA, see Frahm, 137 F.3d at 958-59; Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 817-18 (7th Cir. 1997), we have made clear that fiduciaries must communicate material facts affecting the interests of plan participants or beneficiaries and that this duty to communicate exists when a participant or beneficiary "asks fiduciaries for information, and even when he or she does not," Anweiler, 3 F.3d at 991.

As we already have noted, an ERISA plan's SPD must be "written in a manner calculated to be understood by the average plan participant" and must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. sec. 1022(a). Moreover, the SPD must contain, among other items, information regarding "the plan's requirements respecting eligibility for participation and benefits" and also a description of the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. sec. 1022(b).

We agree with the district court that the 1995 SPD as well as the Plan's COBRA documents failed to provide material information that affected Ms. Bowerman's interests under the Plan. Specifically, the Plan documents failed to explain how maintaining paid-up COBRA coverage rendered inapplicable a new pre-existing condition limitation period when an employee was rehired and eligible for immediate medical coverage. The Plan documents failed to explain adequately the relationship between COBRA coverage and regular coverage for employees who left Wal-Mart's employ but then returned shortly thereafter.

ERISA does not require "plan administrators to investigate each participant's circumstances and prepare advisory opinions for literally thousands

of employees," Chojnacki, 108 F.3d at 817-18, but it does require plans to provide material information to participants and beneficiaries. In this case, the information the Plan should have provided to Ms. Bowerman would not have been information unique to her situation; rather, the information she needed would have been information relevant to all Plan participants who were rehired by Wal-Mart within a few weeks or months after leaving the company. The Plan's explanation of its policy in the 1995 SPD simply failed to fully and fairly communicate how the policy would work to the benefit of any of the Plan's participants who found themselves in such circumstances.

As the district court explained, Ms. Bowerman not only received inadequate explanations in the Plan's documents, she also received inaccurate and misleading information from those she thought would answer the questions created by the Plan's inadequate documents. Both Spencer and the service representative failed to provide accurate and forthright answers to Ms. Bowerman's queries about her coverage in general and about her need to obtain COBRA coverage. In analogous circumstances, the Court of Appeals for the Second Circuit has held an ERISA plan's fiduciary liable for a breach of fiduciary duty when the plan's documents provided inaccurate disclosures and therefore provided the participant with no recourse to verify the accuracy of the information given by the non-fiduciary agent. See Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 9-10 (2d Cir. 1997). Similarly, in Schmidt, we warned that "[i]f the written materials [are] inadequate, then the fiduciaries themselves must be held responsible for the failure to provide complete and correct material information in the event that a nonfiduciary agent provides misleading information." Schmidt, 128 F.3d at 548. Ms. Bowerman's situation presents us with this very scenario.

In contrast to the situation in Schmidt, in which we held that the plan documents were adequate, the Wal-Mart Plan provided Ms. Bowerman with documents that failed to explain adequately the relationship between COBRA coverage, the pre-existing condition limitation, and the Plan's rehire policy. This problem with the Plan documents themselves was then exacerbated by the incorrect and misleading answers provided by Spencer and the service representatives when Ms. Bowerman inquired about her coverage under the Wal-Mart Plan. In these circumstances, we hold that Wal-Mart breached its fiduciary duty by failing to provide complete and accurate information to Ms. Bowerman regarding the terms of the Plan.

2.

We now turn to the appropriate remedy for this violation of fiduciary duty. The district court believed that Ms. Bowerman could not obtain individual relief because 29 U.S.C. sec. 1132(a)(3) precluded such individual relief. Instead, the court explained, the most Ms. Bowerman could obtain for the Administrator's breach of its fiduciary duty was "an injunction against Wal-Mart, ordering it to cease administering the Plan in a way that is not supported by, or apparent in, the written provisions." R.78 at 37. Thus, the district court ordered Wal-Mart "to fully disclose the relationship between COBRA and the pre-existing condition limitation upon rehire in less than one year, so that the average person can understand his or her rights and obligations under the Plan." Id. In our view, however, this remedy is not appropriate in this case.

Section 1132(a)(3) allows a participant to bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . to obtain appropriate equitable relief . . . to redress such violations." 29 U.S.C. sec. 1132(a)(3). A fiduciary's breach of fiduciary duties violates ERISA. In Varity v. Howe, 516 U.S. 489 (1996), the Supreme Court held that individuals could obtain individual relief under sec. 1132 (a)(3). See id. at 509-15. Therefore, we cannot agree with the district court that Ms. Bowerman could not obtain individual equitable relief for the breach of fiduciary duty under sec. 1132(a)(3).

In Mertens v. Hewitt Associates, 508 U.S. 248 (1993), the Supreme Court held that "appropriate equitable relief" under sec. 1132(a)(3) is limited to traditional equitable remedies such as awarding an injunction or restitution. See id. at 255. The district court therefore correctly decided that "legal" remedies, such as money damages, are not "appropriate equitable relief" under sec. 1132(a)(3). However, "when sought as a remedy for breach of fiduciary duty[,] restitution is properly regarded as an equitable remedy because the fiduciary concept is equitable." Health Cost Controls of Ill., Inc. v. Washington, 187 F.3d 703, 710 (7th Cir. 1999), cert. denied, 120 S. Ct. 979 (2000); accord Strom v. Goldman, Sachs & Co., 202 F.3d 138, 144-45 (2d Cir. 1999) (holding that, for a breach of fiduciary duty, restitution would be "equitable relief" within the meaning of sec. 1132 (a)(3)). Because the Plan's Administrator has breached its fiduciary duty to Ms. Bowerman, she is entitled to the equitable remedy of restitution. In this

case, we see no reason why that remedy cannot take the same form as the remedy fashioned by the district court with respect to the equitable estoppel claim. Ms. Bowerman ought to have an opportunity to tender the COBRA payment that would have been paid if the Plan had lived up to its obligation to inform her fully of the operation of the Plan. If she makes that payment, the Plan then must pay the maternity-related medical expenses that it has refused to pay in reliance on the pre-existing condition limitation.

   The district court's misreading of the statute and of the Supreme Court's decision in Varity caused it to enter an injunction for Plan-wide relief. Such relief was not requested by Ms. Bowerman. Accordingly, we modify the court's judgment to eliminate this relief from its equitable remedy.

C.  Attorneys' Fees and Costs

   Wal-Mart also appeals the district court's award of attorneys' fees to Ms. Bowerman. ERISA provides that, in an action brought by a participant, beneficiary or fiduciary, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. sec. 1132(g)(1). We have said that district courts entertain a "modest presumption" that prevailing parties are entitled to a reasonable attorneys' fee. Little v. Cox's Supermarkets, 71 F.3d 637, 644 (7th Cir. 1995). This modest presumption, however, is rebuttable. See Harris Trust & Savs. Bank v. Provident Life & Accident Ins. Co., 57 F.3d 608, 617 (7th Cir. 1995). We review a district court's award of attorneys' fees for an abuse of discretion. See Trustmark Life Ins. Co. v. University of Chicago Hosps., 207 F.3d 876, 884 (7th Cir. 2000). "'A district court's determination will not be disturbed if it has a basis in reason.'" Id. (quoting Little, 71 F.3d at 644).

   To determine whether a prevailing party is entitled to attorneys' fees, we have employed two formulas in ERISA actions. See Quinn v. Blue Cross and Blue Shield Ass'n, 161 F.3d 472, 478 (7th Cir. 1998); Little, 71 F.3d at 644; Harris Trust, 57 F.3d at 616-17 & n.5; Meredith v. Navistar Int'l Transp. Corp., 935 F.2d 124, 128 (7th Cir. 1991). Under the first test used in this circuit, we look to five factors: 1) [T]he degree of the offending parties' culpability or bad faith; 2) the degree of the ability of the offending parties to satisfy personally an award of attorney's fees; 3) whether or not an award of attorney's fees against the offending parties would deter other

persons acting under similar circumstances; 4) the amount of benefit conferred on members of the plan as a whole; and 5) the relative merits of the parties' positions.

Quinn, 161 F.3d 478 (citing Filipowicz v. American Stores Benefit Plans Comm., 56 F.3d 807, 816 (7th Cir. 1995)). Under the second test, we look to whether or not the losing party's position was "'substantially justified.'" Id. (quoting Bittner v. Sadoff & Rudoy Indus., 728 F.2d 820, 830 (7th Cir. 1984)). Regardless of which test is used, however, the question asked is essentially the same: "[W]as the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" Id. (quotation marks and citations omitted); see also Trustmark, 207 F.3d at 884 (stating that this question is the "general test" for analyzing whether a party is entitled to attorneys' fees in an ERISA case); Little, 71 F.3d at 644 (calling this question the "bottom-line" question); Meredith, 935 F.3d at 128 (same).

The district court articulated both of the standards employed in this circuit and then awarded Ms. Bowerman attorneys' fees and costs in this action. The district court provided several reasons for its decision to award attorneys' fees to Ms. Bowerman. First, the district court noted the modest presumption favoring an award to Ms. Bowerman as the prevailing party. Moreover, the court explained that Wal-Mart had provided "no argument or evidence" to oppose an award. R.78 at 39. Finally, the court found that Wal-Mart's position had not been substantially justified because Wal-Mart had "admitted that the way it applied the Plan was not disclosed in the Plan documents, it conceded that [Ms.] Bowerman would have been entitled to benefits for her pregnancy had she only paid a one-month premium for COBRA, it did not and could not deny that Spencer told [Ms.] Bowerman she did not need COBRA, and it acknowledged that its customer service department inexplicably delayed, and made mistakes with respect to, ascertaining [Ms.] Bowerman's status under the Plan." Id. In these circumstances, we cannot say that the district court abused its discretion in awarding attorneys' fees and costs to Ms. Bowerman, and we therefore uphold its determination.

Conclusion

We hold that the Plan should be estopped from denying benefits for Ms. Bowerman's pregnancy. Ms. Bowerman should make the COBRA premium payment that was due on October 9. Thereafter, the Plan must cover those pregnancy-related expenses that would have been covered under the

Plan had there been no gap in coverage. The district court's imposition of Plan-wide relief, however, is inappropriate and, upon receipt of our mandate, the district court shall amend its judgment to eliminate that requirement. We therefore modify the judgment of the district court in this one regard but otherwise affirm that judgment. Within 15 days of the issuance of our mandate, Ms. Bowerman may make application in the district court for her attorneys' fees on this appeal. Ms. Bowerman may recover her costs in this court.

AFFIRMED AS MODIFIED

/1 The 1995 SPD defined the pre-existing condition limitation in this manner:

Any charge with respect to any participant for any illness, injury, or symptom (including secondary conditions and complications) which was medically documented as existing, or for which medical treatment, medical service, prescriptions, or other medical expense was incurred within 12 months preceding the effective date of these benefits as to that participant, shall be considered pre-existing and shall not be eligible for benefits under this [Plan], until the participant has been continuously covered under this [Plan] 12 consecutive months. (Pre-existing conditions include any diagnosed or undiagnosed condition.)

R.28, Ex.1 (1995 SPD) at D-5.

/2 The 1995 SPD stated, in relevant part:

Your coverage and/or the coverage of your dependent will terminate . . . [upon the] [t]ermination of your employment (i.e., last day worked--clocked in) . . . .

R.28, Ex.1 (1995 SPD) at C-3.

/3 It appears that the Plan's COBRA department routinely ignored the stated reasons for discontinuing coverage, and by Wal-Mart's records, the first date that a Plan representative handled Ms. Bowerman's form was on January 15, 1996. By this time, though, Ms. Bowerman's COBRA coverage had been terminated because she had not paid her premium.

/4 The Plan recorded nearly all of the telephone calls to its service representatives, and transcripts of these recorded calls have been made part of the record in this case.

/5 The employee had accessed the Plan's system electronically and had discovered that Ms. Bowerman's coverage was terminated as of July 20 and that she had a new effective date of August 20.

/6 We also note that, because punitive damages are not available in an ERISA action, the district court held that Ms. Bowerman could not recover punitive damages from Wal-Mart.

/7 Although Ms. Bowerman's complaint set forth claims under sec. 1132(a)(1)(B) and sec. 1132(a)(3), we note that the district court appropriately characterized the gravamen of Ms. Bowerman's allegations as falling within the ambit of sec. 1132(a)(3).

/8 See also Russo v. Health, Welfare & Pension Fund, Local 705, Int'l Bhd. of Teamsters, 984 F.2d 762, 767 (7th Cir. 1993); Pohl v. National Benefits Consultants, Inc., 956 F.2d 126, 128 (7th Cir. 1992); Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992).

/9 Indeed, in Gallegos, we held that a party may be precluded from asserting the defense of exhaustion of administrative remedies when "that failure results from the claimant's reliance on the written misrepresentations of the insurer or plan administrator." 210 F.3d at 810. We also have applied estoppel in the context of an employer's written assurance that a particular employee would be a participant in the ERISA benefit plan. See Miller, 39 F.3d at 758-59.

\10 Although we have discussed in passing the Eleventh Circuit's approach, we have not had occasion to adopt it definitively. See Thomason v. Aetna Life Ins. Co., 9 F.3d 645, 650 (7th Cir. 1993); Schoonmaker v. Employee Savs. Plan of Amoco Corp. & Participating Cos., 987 F.2d 410, 413-14 (7th Cir. 1993); Russo, 984 F.2d at 767-68.

/11 The district court is not alone in its reliance on the concept of apparent authority in this context. In Taylor v. Peoples Natural Gas, Co., 49 F.3d 982 (3d Cir. 1995), the Court of Appeals for the Third Circuit considered whether an ERISA plan fiduciary could be held liable for a breach of fiduciary duty precipitated by misstatements made by a non-fiduciary agent acting with apparent authority. The non-fiduciary in Taylor was an employee of the plan's sponsor, not the fiduciary, and was a supervisor of employee benefits. The non-fiduciary had provided advice to a plan participant regarding possible changes in the plan. The court looked to the federal

common law of agency and, in particular, the common law requirements for apparent authority. Apparent authority arises, the court explained, "in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority." Id. at 989 (quotation marks and citation omitted). According to the court, under the circumstances present in that case, the plan's participants reasonably believed that the fiduciary had given the supervisor of employee benefits the authority to counsel them regarding possible changes in the plan. Thus, the court held that the fiduciary would be liable "for any affirmative material misrepresentations" made by the supervisor regarding the possible changes in the plan. Id.