In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 04-4258

EARLENE JENKINS,

*Plaintiff-Appellant*,

*v.*

MICHAEL D. YAGER and MID AMERICA
MOTORWORKS, INCORPORATED, formerly
known as MID AMERICA DIRECT,
INCORPORATED,

*Defendants-Appellees*.

————————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03 C 4007—**J. Phil Gilbert**, *Judge.*

————————

ARGUED SEPTEMBER 26, 2005—DECIDED APRIL 14, 2006

————————

Before EASTERBROOK, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Earlene Jenkins, who brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., appeals the district court's grant of summary judgment in favor of plan administrator Michael Yager and her former employer Mid America Motorworks ("Mid America"). For the reasons set forth in this opinion, we affirm in part and reverse in part the judgment of the district court, and remand the case

to the district court for further proceedings consistent with
this opinion.

# I

# BACKGROUND

## A. Facts

Ms. Jenkins was an employee of Mid America, an auto-
parts distributor, from August 1988 through September
2002. Michael Yager owns and operates Mid America
and serves as the company's president.

In mid-1991, Mid America established a profit-sharing
and pension plan for the company's 100-plus employees. At
all times relevant to this litigation, Mid America was
the plan administrator and Mr. Yager was the plan trustee.
The plan was prepared by RSM McGladrey, Inc., and was
reviewed by Mid America's attorneys. Dwight Erskine,
the Registered Principal of Raymond James Financial
Services in Effingham, Illinois, also advised Mr. Yager
regarding the various funds available for the investment of
plan funds, and Mr. Yager purchased the funds for the plan
through Erskine's office.[1]

Under the profit-sharing portion of the plan, Mid America
contributes a discretionary amount to the plan at the end of
the year; that amount then is divided among the partici-
pants. The plan requires Mr. Yager to direct the investment

---

[1] In their brief, defendants assert that Erskine was the "financial
advisor" to the plan. Appellees' Br. at 2. However, there is no
clear support for that statement in the record; in the portions
of their depositions contained in the record, neither Mr. Yager
nor Mr. Erskine describe Erskine's role as a "financial advisor."

of the discretionary profit-sharing contribution by Mid America. The profit-sharing assets are invested in four funds marketed by American Funds: American Mutual Fund, The Growth Fund of America ("Growth Fund"), Euro-Pacific Growth Fund and the Capital World Growth & Income ("Capital World") Fund. Under the plan, employees are eligible to collect their profit-sharing earnings along with their pension earnings upon termination, retirement, total and permanent disability, or death. During the years 2000 through 2002, the profit-sharing plan sustained losses of over $400,000.[2]

The plan also contains a pension component. Employees may defer up to fifteen percent of their salary for investment into the pension portion of the plan; Mid America matches that contribution dollar-for-dollar up to the legal limit of six percent of that deferral. The plan provides that plan participants may make limited investment directions as to the salary reduction and the employer-matched plan contributions (the "401(k) assets") by choosing to direct the investment of those assets among four funds marketed by American Funds: Euro-Pacific Growth Fund, The Growth Fund of America ("Growth Fund"), The Income Fund of America ("Income Fund") and The Cash Management Trust of America ("Cash Management Fund"). These options have

---

[2] The profit-sharing plan sustained the following investment losses: in 2000, $165,818.47; in 2001, $98,055.82; and in 2002, $148,119.68. R.25, Ex.4 at 5; R.25, Ex.5 at 5; R.25, Ex.6 at 3. On page seven of the plaintiff's brief, she claims the losses totaled only $241,686. However, her table reveals that this statement is based on an arithmetical error, and that actual losses were over $400,000.

not changed since 1991. During the calendar years of 2000, 2001 and 2002, the plan's 401(k) assets sustained investment losses of over $700,000.[3]

Mr. Yager testified in his deposition that he never reviewed the participants' individual 401(k) investment decisions. From 1991-2002, participants could change their investment directions only once per year. Beginning in 2002, participants could change investment directions once every six months. Prior to 2003, each plan participant received a form letter in November or December that set forth the participant's level of salary deferral and the funds in which the participant's 401(k) funds were invested. The letter further stated that the participant could make changes to the investment of their funds; those changes would be effective January 1 of the following year. Plan participants also were given a statement of the balance of their 401(k) assets once a year, after the end of the calendar year. Under this arrangement, as a practical matter, plan participants had to make investment choices for the following year before they knew how their earlier fund choices had performed in the previous year.

---

[3] In 2000, the Cash Management Fund had a net gain of $2,127.14, the Growth Fund had a gain of $91,493.42 and the Income Fund had a gain of $17,815.31, while the Euro-Pacific Growth Fund had a loss of $158,821.94. R.25, Ex.4 at 3. In 2001, the Cash Management Fund had a gain of $1,507.67 and the Income Fund had a gain of $11,053.81, while the Euro-Pacific Growth Fund had a loss of $97,914.74 and the Growth Fund had a loss of $171,488.66. R.25, Ex.5 at 3. In 2002, the Cash Management Fund had a gain of $469.67, while the Euro-Pacific Growth Fund had a loss of $104,632.89, the Growth Fund had a loss of $286,681.62, and the Income Fund had a loss of $6,505.24. R.25, Ex.6 at 2.

Additionally, Mid America conducted an annual meeting in December for all participants in the plan; at that meeting, Mr. Erksine explained the performance of the funds over the past year and the options available to participants, as well as answered any questions. However, Ms. Jenkins attended only one of these annual meetings during her employment with Mid America. The materials from this meeting also were left in the break room so that employees could review them. Mr. Erskine also stated that he was available in person and by telephone in his office to answer any questions about the four funds; there is no indication from the record that Ms. Jenkins availed herself of his services.

## B. District Court Proceedings

Ms. Jenkins brought this action against Mr. Yager and Mid America, alleging that Mr. Yager's performance fell below the standard imposed on ERISA trustees. The district court denied Ms. Jenkins' motion for summary judgment on December 7, 2004. In doing so, the district court quoted Ms. Jenkins' summary of her position:

> By [1] providing plan participants with unduly restrictive means to direct investments, by [2] failing to prudently monitor the [p]lan's investments, and by [3] failing to operate the [p]lan according to ERISA, Yager and Mid America breached their fiduciary duties to the [p]lan.

R.34 at 2.

The district court began by discussing Ms. Jenkins' third contention. Section 403 of ERISA, 29 U.S.C. § 1103(a), states that "all assets of an employee benefit plan shall be held in trust by one or more trustees," and that those named

trustees "shall have exclusive authority and discretion to manage and control the assets of the plan." There are two explicit exceptions to this rule found in 29 U.S.C. § 1103(a)(1) and § 1103(a)(2), although as discussed later, neither exception applies to the Mid America plan. Ms. Jenkins contended that Mr. Yager and Mid America had violated ERISA by delegating control over plan assets to plan participants. However, the district court noted that section 404(c) of ERISA absolves a fiduciary from liability caused by plan participants when the "pension plan . . . provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account." 29 U.S.C. § 1104(c)(1). The district court stated that "[a] plain reading of that language suggests that participant control is assumed permissible in the first instance, for the statute absolves a fiduciary of liability 'in the case of' a plan providing for individual accounts and allowing participant control." R.34 at 5. The district court then held that an "implied exception" to ERISA's non-delegation provision in section 403 existed for plans that allow participant control, and therefore, Mr. Yager and Mid America did not violate section 403. *Id.*

Next, with respect to Ms. Jenkins' remaining claims, the district court determined that the record established that Mr. Yager did act prudently in selecting and monitoring investments. The district court noted that Mr. Yager had employed a long-term strategy for the investment of the 401(k) funds. He had chosen conservative and stable funds and had decided to remain invested in those funds during periods of market fluctuation. The court then determined that, because Mr. Yager had selected funds that were conservative and not volatile in the long-term, he had not breached his fiduciary duty for not "hastily retreating from that strategy in the face of what appears

to have been nothing more than mere market fluctuation." *Id.* at 8. Additionally, the district court held that Mr. Yager had provided plan participants with all the information that they needed to make informed investment decisions and that he did not violate any duty in not providing additional advice or information. The district court did not address Mr. Yager's fiduciary duty with respect to the profit-sharing funds.

Although the district court denied Ms. Jenkins' motion for summary judgment, it did not grant, at that point, summary judgment to Mr. Yager and Mid America because they had not cross-moved for summary judgment. However, after the district court denied Ms. Jenkins' motion for summary judgment, Ms. Jenkins determined that, based on the district court's interpretation of the law, she could not prevail at trial. Ms. Jenkins stipulated that the defendants' memorandum in opposition to summary judgment could be treated as a motion for summary judgment. In this stipulation, she reserved her right to appeal any final order granting defendants' cross-motion for summary judgment. As a result of the stipulation, the district court granted summary judgment to the defendants and dismissed Ms. Jenkins' claims with prejudice.

## II

## DISCUSSION

We review a district court's grant of summary judgment de novo, drawing all reasonable inferences in the light most favorable to the non-moving party. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004).

## A. The "Implied Exception" to ERISA Sections 403 and 405

Ms. Jenkins submits that the Mid America plan, which allows plan participants to direct their 401(k) funds, violates ERISA provisions that forbid the delegation of trustee duties.

### 1.

In evaluating Ms. Jenkins' submission, we begin with section 403(a) of ERISA. It states:

> Except as provided in subsection (b) of this section, all assets of an employee benefit plan shall be held in trust by one or more trustees. Such trustee or trustees shall be either named in the trust instrument or in the plan instrument described in section 1102(a) of this title or appointed by a person who is a named fiduciary, and upon acceptance of being named or appointed, the trustee or trustees shall have *exclusive authority and discretion* to manage and control the assets of the plan. . . .

29 U.S.C. § 1103(a) (emphasis added). Section 403(a) has two explicit exceptions that are found in 29 U.S.C. § 1103(a). As the statutory text makes clear, neither of these exceptions are pertinent to our present inquiry. More precisely, that section provides:

> (1) the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter, or

(2) authority to manage, acquire, or dispose of assets of the plan is delegated to one or more investment managers pursuant to section 1102(c)(3) of this title.

*Id.* § 1103(b). Because these exceptions are not applicable, we must determine whether any other provisions of ERISA provide authorization for the arrangement found in the plan under review. We therefore must determine whether other provisions of the statute are pertinent to our inquiry.

**2.**

In undertaking this inquiry, we turn first to ERISA section 405(c) to determine the responsibilities of the trustee under the plan before us. That subsection provides that a plan instrument may allocate "fiduciary responsibilities (other than trustee responsibilities)" among named fiduciaries and to other persons designated by named fiduciaries. 29 U.S.C. § 1105(c)(1). Section 405(c) further defines "trustee responsibilities" as "any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan." *Id.* § 1105(c)(3).

Mid America's plan instrument, labeled "Employee Savings and Profit Sharing Plan," sets forth the responsibilities of the trustee.[4] R.25, Ex.8 at 1. The trustee's powers

---

[4] 29 U.S.C. § 1105(c)(3) defines trustee responsibilities as "any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan." The Mid America plan did not have a trust instrument, only a plan instrument. However, it appears that the plan instrument subsumed the trust instrument and the one document serves as both. ERISA section

(continued...)

are "to invest, manage, and control" the plan assets consistent with the "funding policy and method" as determined by Mid America. *Id.* at 87. More specifically, the Trustee is to "invest and reinvest the Trust Fund to keep the Trust Fund invested . . . in such securities or property, real or personal, wherever situated, as the Trustee shall deem advisable. . . ." *Id.* The plan instrument also describes the "funding policy and method" that should be established by Mid America by stating that Mid America "shall determine whether the Plan has a short run need for liquidity (e.g., to pay benefits) or whether liquidity is a long run goal and investment growth (and stability of same) is a more current need." *Id.* at 23. The "Trust Fund" is defined as "the assets of the Plan and Trust as the same shall exist from time to time." *Id.* at 17.

The plan instrument also states, for the 401(k) funds, that "[e]ach Participant shall be given the opportunity to direct the Trustee as to the investment of such Participant's account value," with such designations to be "made not more frequently than once in any Plan Year." *Id.* at 62, 66. In

---

[4] (...continued)
402(a)(1) states that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). Additionally, ERISA section 403(a) states that trustee(s) "shall either be named in the trust instrument or in the plan instrument described in section 402(a) or appointed by a person who is a named fiduciary." *See id*. § 1103(a). Therefore, ERISA does not mandate a separate written trust agreement. In this case, the plan instrument defines the Trust and sets forth trustee responsibilities. R.25, Ex.8 at 17, 87-95. It also refers to itself as "[t]his Plan and Trust." *Id.* at 98. Therefore, the trustee responsibilities laid out in the plan instrument are the trustee responsibilities at issue in 29 U.S.C. § 1105(c)(3).

addition, a separate "Directed Investment Account" shall be made for each participant, and such account "shall not share in Trust Fund earnings, but it shall be charged or credited as appropriate with the net earnings, gains, losses and expenses as well as any appreciation or depreciation in market value during each Plan Year attributable to such account." *Id.* at 67.

As established by the plan, the duty to invest the plan assets was a "trustee responsibility" under section 405(c)(3); authority to delegate that duty cannot be found in section 403(c)(1). Since section 405 does not provide an exception to section 403(a), we must look elsewhere in ERISA to find authorization for the plan's participant-directed investments.

**3.**

ERISA section 404, which sets forth the standard of care for a fiduciary, provides that no fiduciary shall be liable for any loss which results from a plan participant or beneficiary's exercise of control in participant-directed plans. *See* 29 U.S.C. § 1104(c). However, in order to qualify as a participant-directed plan eligible for the liability shield of section 404(c), a plan must meet a number of conditions; prominent among them is that it must provide at least three investment options and it must permit the participants to give instructions to the plan with respect to those options at least once every three months. 29 C.F.R. § 2550.404c-1(b)(2)(c). It is undisputed that the Mid America plan does not qualify under section 404(c) because there is no opportunity to change investments once every three months. Therefore, we must determine whether compliance with section 404(c) is the exclusive method of creating a participant-directed exception to sections 403 and 405.

Although section 404(c) and its accompanying regulation, 29 C.F.R. § 2550.404c-1, create a safe harbor for a trustee, we see no evidence that these provisions necessarily are the only possible means by which a trustee can escape liability for participant-directed plans. As 29 C.F.R. § 2550.404c-1(a)(2) states:

> The standards set forth in this section are applicable solely for the purpose of determining whether a plan is an ERISA section 404(c) plan and whether a particular transaction engaged in by a participant or beneficiary of such plan is afforded relief by section 404(c). *Such standards, therefore, are not intended to be applied in determining whether, or to what extent, a plan which does not meet the requirements for an ERISA section 404(c) plan or a fiduciary with respect to such a plan satisfies the fiduciary responsibility or other provisions of Title I of the Act.*

(emphasis added). The Department of Labor also has stated that, for plans that do not meet the regulatory definition of a section 404(c) participant-directed plan, "noncomplying plans do not necessarily violate ERISA; noncompliance merely results in the plan not being accorded the statutory relief described in section 404(c)." Final Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans), 57 Fed. Reg. 46,906, 46,907 (Oct. 13, 1992).

Therefore, we agree with the district court and believe that the statute, when read as a whole along with the accompanying regulations, permits a plan trustee to delegate decisions regarding the investment of funds to plan participants even if the plan does not meet the requirements for the section 404(c) safe harbor. Therefore, there is an "implied exception" to sections 403 and 405 for participant-directed plans, allowing plan participants to direct the

investment of their own plan funds. If a participant-directed plan does not meet the conditions set forth in 29 C.F.R. § 2550.404c-1(b), the plan trustee and fiduciaries simply do not receive the benefits of section 404(c), and they are not shielded from liability for losses or breaches of duty which result from the plan participant's exercise of control. It does not necessarily mean that such a plan violates ERISA; instead, the actions of the plan trustee, when delegating decision-making authority to plan participants, must be evaluated to see if they violate the trustee's fiduciary duty.

## B. Violation of Fiduciary Duty

ERISA section 404 imposes standards of fiduciary duty, including the fiduciary's duty to act "with the care, skill, prudence, and diligence" as would a prudent man under the same circumstances. 29 U.S.C. § 1104(a)(1)(B). If a fiduciary breaches his duty, he can be personally liable to the plan for any losses to the plan resulting from his breach, as well as can be "subject to such other equitable or remedial relief as the court may deem appropriate. . . ." 29 U.S.C. § 1109(a).

To state a claim for a violation of fiduciary duty, the plaintiff must "establish: (1) that the defendants are plan fiduciaries; (2) that the defendants breached their fiduciary duties; and (3) that the breach caused harm to the plaintiff." *Brosted v. UNUM Life Ins. Co. of America*, 421 F.3d 459, 465 (7th Cir. 2005) (citing *Kamler v. H/N Telecomm. Serv., Inc.,* 305 F.3d 672, 681 (7th Cir. 2002)). The first prong is not at issue in this case as Mr. Yager, as trustee of the plan, and Mid America, as administrator of the plan, are both fiduciaries under ERISA section 3(21)(A). *See* 29 U.S.C. § 1002(21)(A).

As for the second prong, "ERISA's fiduciary duty was meant to hold plan administrators to a duty of loyalty akin to that of a common-law trustee." *Ameritech Benefit Plan Comm. v. Comm. Workers of America*, 220 F.3d 814, 825 (7th Cir. 2000). Accordingly, "[t]he fiduciary must act as though [he] were a reasonably prudent businessperson with the interests of all the beneficiaries at heart." *Id.*

Ms. Jenkins submits that Mr. Yager breached his fiduciary duties by failing to "investigate, make, and monitor the Plan's investments as required by the fiduciary duty of prudence." Appellant's Br. at 21.[5] Ms. Jenkins also alleges that Mid America violated their fiduciary duty by failing to monitor adequately Mr. Yager and by failing to take appropriate actions to remedy Mr. Yager's fiduciary breaches. R.1 at 4. Under ERISA section 405, a fiduciary is responsible for a breach of duty by another fiduciary if he knew of the breach and did not take action to remedy the breach. 29 U.S.C. § 1105(a)(3). Therefore, Mid America could be liable if we determine that Mr. Yager breached his fiduciary duty. Ms. Jenkins raises two distinct claims for breach of fiduciary duty: one related to the plan's 401(k) funds, and one related to the plan's profit-sharing funds.

---

[5] In Ms. Jenkins' complaint, she states that Mr. Yager did not take "adequate action to monitor, review, and change the investment of Plan assets"—not that he breached his duty in choosing the initial funds. R.1 at 2. In her brief, her complaints center on the fact that he did not change the investments over time in response to market pressures. She does not argue that the initial selection of the various American Funds for plan investments violated a fiduciary duty.

### 1. 401(k) Funds

As for the 401(k) funds, it does not appear that Mr. Yager breached his fiduciary duty to plan participants in his initial selection of the funds, his monitoring of the funds or in the information provided to plan participants to assist in their investment choices. When initially selecting the funds, Mr. Yager testified that, in choosing the American Funds, he saw them as a "long-term plan." R.26, Ex.3 at 40. He stated that he had selected funds with a good "long-term record" and an "ability to perform in an up market or a down market." *Id.* The Third Circuit has said that "the adequacy of a fiduciary's independent investigation and ultimate investment selection is evaluated in light of the 'character and aims' of the particular type of plan he serves." *In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 434 (3d Cir. 1996) (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)). In this case, Mr. Yager's investment strategy was to find long-term, conservative, reliable investments that would do well during market fluctuations. It was part of his investment strategy to pick solid funds and to stay with them long-term. We cannot say such a strategy was unreasonable or imprudent.

Mr. Yager also did not breach his duty in failing to monitor or alter the investments once the four funds were selected in 1991. Ms. Jenkins contends that Mr. Yager did not stay adequately aware of losses in the funds. However, Mr. Erskine testified in his deposition that he spoke to Mr. Yager about once a week and frequently discussed the performance of the plan's funds, as well as other funds. Mr. Erskine also testified that he provided Mr. Yager with written information on fund performance at least six times a year, including fund reports, prospectuses and newspaper articles. Mr. Yager testified that he reviewed

the reports for the four funds each year. Therefore, it appears that Mr. Yager adequately monitored the funds.

Similarly, Mr. Yager did not breach his fiduciary duties by keeping the same four mutual funds for 401(k) fund investment from 1991 until present. Ms. Jenkins contends that Mr. Yager should have considered moving some of the plan assets out of the three funds that were losing money in 2000, 2001 and 2002.[6] While three of the four funds did lose money in 2000, 2001 and 2002, that alone is not evidence that Mr. Yager violated his fiduciary duty. We have stated that investment losses are not proof that an investor violated his duty of care. *See DeBruyne v. Equitable Life Assurance Soc. of the United States*, 920 F.2d 457, 465 (7th Cir. 1990). Mr. Yager, in his deposition, reiterated that his strategy was to pick conservative funds that would perform well during market fluctuation. He stated that he would stay with those funds even in a year where the fund loses money because, in the long-term, those funds would still perform well. Mr. Yager, in keeping the four mutual funds, did not violate his standard of care. Nothing in the record suggests that it was not reasonable and prudent to select conservative funds with long-term growth potential and to stay with those mutual funds even during years of lower performance. Notably, Ms. Jenkins does not suggest any *concrete* course of

---

[6] Ms. Jenkins herself could have changed the direction of her investment and directed Mr. Yager to invest her 401(k) funds for years 2000, 2001 and 2002 in a fund that was not losing money. However, she did not do so, electing to invest 50% into the Euro-Pacific Growth Fund and 50% into the Growth Fund for each of those years. R.25, Ex.3 at 1-3. As noted above, the Euro-Pacific Growth Fund lost money in 2000, and both the Euro-Pacific Growth Fund and the Growth Fund lost money in 2001 and 2002.

action that would have been better than the one selected by Mr. Yager.

Finally, Mr. Yager did not breach his duty in allowing plan participants to direct their investments. We previously have stated that fiduciaries must communicate "material facts affecting the interests of plan participants or beneficiaries," even when the participants or beneficiaries do not ask for such information. *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000). Mr. Yager set up an informational meeting each year at which Mr. Erskine would discuss the various funds' performance and outlook and at which materials on fund performance would be distributed. Additionally, the materials with information about the various funds were left in the company break room, so that all employees would have access to the information. Although Ms. Jenkins claims that Mr. Yager violated his fiduciary duty by failing to review each participants' investment directions throughout the year to ensure they were appropriate, we have held that ERISA does not require "plan administrators to investigate each participant's circumstances and prepare advisory opinions for literally thousands of employees." *Id.* at 590-91 (citing *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 817-18 (7th Cir. 1997)).[7] Mr. Yager provided his employees with the necessary information to enable them to direct the invest-

---

[7] While *Bowerman* and *Chojnacki* refer to the duty to inform employees about health benefits and severance benefits, not the duty to inform employees as to the prudent way to invest their 401(k) funds in a participant-directed plan, the fiduciary duty at issue is the same as in this case: to what extent fiduciaries must communicate material facts affecting the interests of plan participants. *See Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000); *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810, 817-18 (7th Cir. 1997).

ment of their 401(k) funds among four different funds, including yearly employee meetings with Mr. Erskine. Therefore, he did not breach his fiduciary duty by failing to provide adequate information.

### 2. Profit-Sharing Funds

Next, we turn to Ms. Jenkins' claim that Mr. Yager violated his fiduciary duty to the plan by his failure to make a prudent, reasonable investigation of the profit-sharing investments and by failing to monitor those investments.[8] Ms. Jenkins relies on Mr. Yager's deposition testimony to support her claim, where the following exchange occurred:

> Q: With respect to the [profit-sharing] contribution that is made in any given year, what percentages of those—of that contribution goes into each of these four funds?
>
> A: I have no knowledge of how that's—I don't recall how that is made.
>
> . . . .
>
> Q: Do you know? Is [the distribution among the funds] equal? Is it 25 percent to each of 'em, or—
>
> A: No, I don't know how that's—don't recall how that is split up.

---

[8] Though the district court did not address Ms. Jenkins' claim that Mr. Yager and Mid America breached their fiduciary duties with regard to the profit-sharing funds, Ms. Jenkins did argue that such a breach had been committed in her motion for summary judgment. *See* R.25 at 7-8, 14. Ms. Jenkins renews her argument in her appellate brief, *see* Appellant's Br. at 22-23, as well as in her reply brief, *see* Appellant's Reply Br. at 12.

    Q:  Do you know what documents there might be to
        show how those are split up?

    A:  No. Not aware of anything.

R.25, Ex.7 at 107-08. Mr. Yager further testified that he did
not recall considering or making any changes as to how
the profit-sharing money was invested since 1991. *Id.* at 112.
When asked who would know how the money is
to be invested, Mr. Yager replied that it would be a "Dwight
[Erskine]/McGladrey-type situation" and that Mr. Erskine
would have the information on how the profit-sharing
money was allocated amongst the four different funds. *Id.*
at 110-12. However, Mr. Erskine testified that it was his
understanding that Mr. Yager made the decisions as to how
profit-sharing contributions would be invested amongst the
four funds. R.26, Ex.5 at 42.

   From the record, it is unclear exactly how the profit-
sharing contribution was allocated across the four funds.
Mr. Erskine testified that he believed that the Capital World
Fund was given a larger share of the contribution in order
to "get a little more of the international element into the
plan." *Id.* at 44-45. The annual reports in the record for the
profit-sharing funds support Mr. Erskine's recollection of
profit-sharing investments.[9]

---

[9]  In 2000, the profit-sharing fund made purchases of $9,468.26 in
the American Mutual Fund, $45,813.56 in the Growth Fund,
$19,801.96 in the Euro-Pacific Growth Fund, and $82,281.09 in the
Capital World Fund. R.25, Ex.4 at 5. In 2001, the profit-sharing
fund made purchases of $6,777.16 in the American Mutual Fund,
$536.30 in the Growth Fund, $3,796.81 in the Euro-Pacific Growth
Fund, and $16,843.28 in the Capital World Fund. R.25, Ex.5 at 5.
In 2002, the profit-sharing fund made purchases of $4,771.68 in

(continued...)

Unlike the situation with the 401(k) funds, Mr. Yager, as trustee, retained all responsibility to "invest, manage, and control the [p]lan assets." R.25, Ex.8 at 87. A trustee is required to use due care and diligence when investing plan funds, meaning that he or she must "employ[] the appropriate methods to investigate the merits of the investment and to structure the investment." *Eyler v. C.I.R.*, 88 F.3d 445, 454 (7th Cir. 1996) (citing *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)); *see also Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002) (citing cases); *In re Unisys*, 74 F.3d at 434. Viewing Mr. Yager's deposition statements in the light most favorable to Ms. Jenkins, it appears that Mr. Yager did not explore the merits of investing the profit-sharing money, nor did he select what proportion of the money to invest in each of the four funds each year, even though he was investing new money into the funds annually during this time period.[10] If Mr. Yager delegated the investment decision-making to Mr. Erskine or to RSM

---

[9] (...continued)

the American Mutual Fund, $2,457.69 in the Growth Fund, $2,460.52 in the Euro-Pacific Growth Fund, and $15,911.75 in the Capital World Fund. R.25, Ex.6 at 3.

[10] *See Roth v. Sawyer-Cleator Lumber Co.,* 16 F.3d 915, 919 (8th Cir. 1994) (stating that deposition testimony "suggesting that the trustees did very little to evaluate the propriety" of their actions with regard to plan assets could support a judgment at trial for the plaintiffs); *but see DeBruyne v. Equitable Life Assurance Soc. of the United States*, 920 F.2d 457, 465 (7th Cir. 1990) (holding that plaintiff's evidence that an investment lost money, coupled with an expert's opinion that a typical funds manager would not have acted as the fiduciary had acted, was not sufficient to rebut the fiduciary's assertion at summary judgment that its investment strategies were prudent).

McGladrey, Inc., as was indicated by his deposition testimony, he was not fulfilling his trustee duty of care and prudence by not making an independent investigation as to the propriety of the profit-sharing investments. The trustee may "take into consideration the advice of qualified others, as long as he exercises his own judgment." *In re Unisys*, 74 F.3d at 434. We have stated that the "degree to which a fiduciary makes an independent inquiry [before acting] is crucial." *Eyler*, 88 F.3d at 456 (holding that the fiduciary's reliance on the opinion of attorneys and a financial advisor was not sufficient to show that the fiduciary "exercised [its] own judgment" before completing an employee stock ownership plan transaction). Therefore, it appears that there are material issues of fact remaining as to whether or not Mr. Yager invested the profit-sharing contributions with the care and diligence that is required of a fiduciary under ERISA.

Finally, we consider the third prong, which is harm to the plaintiff. There also appears also to be a genuine issue of fact as to whether Mr. Yager and Mid America's alleged breaches harmed Ms. Jenkins. According to the plan's annual reports, the profit-sharing fund suffered a loss of $165,818.47 in 2000, $98,055.82 in 2001 and $148,119.68 in 2002. R.25, Ex.4 at 5; R.25, Ex.5 at 5; R.25, Ex.6 at 3. Ms. Jenkins' account also suffered a loss, reflected in her individual plan statements; the profit-sharing portion of her account lost $151.68 in 2000, $1,282.38 in 2001 and $2,637.61 in 2002. R.25, Ex.10 at 8-10. Given that the profit-sharing funds in the plan experienced losses, it is possible that Mr. Yager's alleged breach of his fiduciary obligation caused these losses. For example, Mr. Yager continued to invest a proportionally larger amount of the profit-sharing money into the Capital World Fund in 2000 and 2001, even though it was losing money while the American Mutual Fund was

not. R.25, Ex.6 at 3; R.25, Ex.5 at 5. Had he been monitoring the investments adequately, he might not have made such a choice. It is difficult to tell from the limited record what impact his alleged neglect had on the profit-sharing funds; however, viewing the facts in the light most favorable to Ms. Jenkins, it does appear that there is at least a genuine issue as to whether or not his breach caused the losses to the plan. *See Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994) (stating that the causal connection between breach and loss "is a fact-intensive inquiry" that might not be susceptible to summary judgment in some cases).

Given these remaining issues of material fact, we therefore reverse the district court's grant of summary judgment as to Ms. Jenkins' claim that Mr. Yager and Mid America violated their fiduciary duty to carefully invest and monitor the profit-sharing funds.

### Conclusion

For the foregoing reasons, we affirm the grant of the defendants' motion for summary judgment on claims related to the 401(k) funds and reverse the grant of summary judgment on claims related to the profit-sharing funds. Therefore, the judgment of the district court is affirmed in part, reversed and remanded in part. The parties shall bear their own costs on appeal.

AFFIRMED in part;
REVERSED and REMANDED in part

A true Copy:

      Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*