# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2543

GERI KANNAPIEN and
JANICE ROZHON,

*Plaintiffs-Appellants*,

*v.*

QUAKER OATS COMPANY and
PEPSICO,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6829—**Elaine E. Bucklo**, *Judge*.

ARGUED SEPTEMBER 10, 2007—DECIDED NOVEMBER 14, 2007

Before EASTERBROOK, *Chief Judge*, and KANNE and
EVANS, *Circuit Judges*.

KANNE, *Circuit Judge*. Geri Kannapien and Janice
Rozhon each accepted a severance package from their
employer, the Quaker Oats Company, and retired a few
weeks later. The severance package consisted of bene-
fits to be paid pursuant to written plans governed by
the Employee Retirement Income Security Act of 1974
(ERISA), 29 U.S.C. §§ 1001-1461. Although Kannapien and
Rozhon have received the amounts to which the express
written terms of the plans entitle them, they filed suit
against Quaker and its parent company, PepsiCo, seeking

equitable relief under ERISA, *see* 29 U.S.C. § 1132(a)(3), alleging that Quaker failed to honor the terms of its Retirement Plan. The district court found that Kannapien and Rozhon had failed to produce any genuine issue of material fact that was in dispute and granted summary judgment for the defendants. *See Kannapien v. Quaker Oats Co.*, 433 F. Supp. 2d 895 (N.D. Ill. 2006). We agree and affirm the judgment of the district court.

## I. HISTORY

Kannapien and Rozhon filed a class-action suit against Quaker and PepsiCo in late October 2004, alleging various claims under ERISA. In July 2005, the district court struck all class allegations because the case was not properly brought as a class action. The court granted leave to Kannapien and Rozhon to amend their complaint in November 2005 to add two Illinois state-law claims. After this amendment, Kannapien and Rozhon's complaint raised three classes of claims: (1) ERISA estoppel claims under 29 U.S.C. § 1132(a)(3)(B); (2) ERISA claims for breach of fiduciary duty also under § 1132(a)(3)(B); and (3) Illinois state-law claims for breach of contract and promissory estoppel. After discovery, Quaker and PepsiCo moved for summary judgment, which the district court evaluated based upon the pleadings and affidavits submitted by the parties. The record before the district court established the following facts, which we construe drawing all inferences favor of Kannapien and Rozhon. *See Sides v. City of Champaign*, 496 F.3d 820, 822 (7th Cir. 2007).

The Golden Grain Company operated a manufacturing plant in Bridgeview, Illinois, that produced consumer food products such as Rice-a-Roni and Mission Pasta. Golden Grain originally hired Kannapien and Rozhon as salaried employees on January 28, 1980, and May 16,

1977, respectively. Kannapien worked as an administrative assistant and Rozhon worked as a payroll and insurance clerk. During their employment at Golden Grain's Bridgeview Plant, Kannapien and Rozhon participated in the company's Profit Sharing Plan. Benefits under the Profit Sharing Plan consisted solely of financial contributions made by Golden Grain—employees did not make any monetary contributions.

Quaker Oats acquired Golden Grain in 1986, and Kannapien and Rozhon became employees of Quaker. Quaker did not immediately terminate Golden Grain's Profit Sharing Plan upon taking over, but eventually the funds that had accrued under the Profit Sharing Plan were transferred into separate 401(k) accounts for the benefit of the employees. On July 1, 1990, all salaried employees of Golden Grain, including Kannapien and Rozhon, became participants in the Quaker Retirement Plan, an employee pension benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(2).

In 2001, Quaker merged with a subsidiary of PepsiCo, but retained the Quaker name. As a result of the merger, the Quaker Retirement Plan (as relevant to this litigation) was amended and restated on January 1, 2002. Benefits under the Retirement Plan are calculated using an employee's "credited service" time, which the Retirement Plan expressly states does not include any time an employee served before becoming a participant in the Quaker Retirement Plan. The amended Retirement Plan also entitles employees who were involuntary terminated by the company within two years of the merger to change-in-control benefits, which consist of additional monthly payments to eligible employees. The Retirement Plan does not define what constitutes an involuntarily termination.

In addition to the Retirement Plan, Quaker implemented a Severance Plan that also provided benefits to

employees who were discharged involuntarily. Unlike the Retirement Plan, benefits under the Severance Plan are determined using a period of time that commences with an employee's date of hire by a company "acquired by Quaker." The benefits under the Severance Plan are unrelated to the basic benefits under the Retirement Plan or to the change-in-control benefits provided under the Retirement Plan, except that both the Severance Plan benefits and change-in-control benefits are available only to involuntarily discharged employees.

In December 2002, both Kannapien and Rozhon received statements that estimated their basic pension benefits under the Retirement Plan. These statements each contained the disclaimer that they merely estimated Retirement Plan benefits and that they were not official Plan documents. The estimate statements further stipulated that "in the event of a conflict between this statement and the official Plan documents, the official Plan documents will govern."

The estimate statement sent to Kannapien contained a clerical error that listed her credited service as beginning on January 28, 1980—her hire date at Golden Grain. But under the express written terms of the Retirement Plan, Kannapien's credited service did not begin until July 1, 1990, the date she became a participant in the Quaker Retirement Plan. Similarly, Rozhon received an erroneous estimate statement that detailed her credited service as beginning on May 16, 1977, her hire date with Golden Grain, instead of the July 1, 1990 date. Despite listing incorrect credited service start dates, the estimate statements received by Kannapien and Rozhon used the proper time interval under the Retirement Plan's terms (from July 1, 1990 to December 2002) to accurately estimate the actual dollar amounts that each would receive under the Plan.

In 2003, following the sale of its Mission Pasta product line, PepsiCo began to decrease production at the Bridgeview plant. In light of this, the Plant Manager, Tom Winters, received approval to decrease the plant's labor costs. In order to reduce its workforce, Quaker offered to give its employees who volunteered for early retirement not only their standard benefits under the Retirement Plan, but also two additional benefits reserved for involuntarily terminated employees. Specifically, employees who elected for early retirement would be deemed eligible to receive benefits under the Severance Plan, as well as the change-in-control benefits under the Retirement Plan.

Accordingly, Winters held a meeting at the Bridgeview plant in early 2003, during which he stated that the company was looking for employees who would be interested in leaving. He directed interested employees to obtain information from Jeffrey Satterlee, the Human Resources Manager. Kannapien, who served as an administrative assistant to Winters, asked Winters if she should consider contacting Satterlee. Winters encouraged her to do so and told her that she "would be very pleased" by the amount she would receive if she left the plant. At the time he made this statement to Kannapien, Winters had no knowledge of the actual dollar amount of Kannapien's benefits.

Neither Kannapien, nor Rozhon, had considered retiring before 2003, but each contacted Satterlee after the plant meeting. Satterlee met with Kannapien and Rozhon separately and presented each with personalized written documentation prepared by Quaker's Employee Administration Center, that described the additional benefits available to them if they retired early: namely, the change-in-control benefits under the Retirement Plan and the benefits under the Severance Plan. Nothing in the documents prepared by the Employee Administration Center

stated anything about the basic benefits employees would receive under the Retirement Plan, nor did anything in these documents purport to supplant or modify the terms of the Retirement Plan. The documentation prepared by the Employee Administration Center informed Kannapien and Rozhon that the change-in-control benefits would be paid from the Retirement Plan and would be based on "years of service." While the documents did not define the term "years of service," the Retirement Plan stipulates that "years of service" include only relevant years for vesting purposes—the years of credited service, determined once an employee has begun participating in the Quaker Retirement Plan.

At his meetings with Kannapien and Rozhon, Satterlee did not discuss their respective standard benefits under the Retirement Plan, nor did Satterlee represent that the offer of additional Severance Plan and change-in-control benefits would alter the unambiguous language of the Retirement Plan. In fact, Satterlee told both women that he "couldn't calculate their pension benefit," and advised each of them to contact the Employee Administration Center to obtain an estimate. However, at his meetings with Kannapien and Rozhon, Satterlee mistakenly informed each of them that their change-in-control benefits would be calculated based on their original Golden Grain hire dates instead of the proper date under the terms of the Retirement Plan, July 1, 1990. Kannapien and Rozhon admitted in separate depositions that Satterlee made an honest mistake in misstating the pertinent dates to them, and that they relied heavily on this mistake in deciding to retire.

After their meetings with Satterlee, Kannapien and Rozhon each agreed to retire so they could receive the additional Severance Plan and change-in-control benefits. Both women ended their employment with Quaker in late April 2003. For about a year after retiring,

Kannapien and Rozhon each received benefits according to the terms of the Severance Plan: Kannapien received $47,800 and Rozhon received $42,250. Kannapien and Rozhon also admitted in their depositions that the receipt of these funds from the Severance Plan motivated their decisions to retire.

In May 2004, Kannapien and Rozhon each received a statement summarizing the remaining benefits owed to her under the Retirement Plan. These statements calculated both the basic and change-in-control benefits according to the terms of the Retirement Plan and awarded each woman benefits based upon 13.8951 years of credited service—the time span from July 1, 1990, until May 2004. Upon receiving these statements, Kannapien and Rozhon separately contacted Satterlee to express concern over the calculation of their benefits under the Retirement Plan because both women expected their credited service to be calculated using their hire dates with Golden Grain. Satterlee, in turn, contacted the Employee Administration Center on behalf of Kannapien and Rozhon and also advised Kannapien and Rozhon on how to appeal the benefits calculations.

Kannapien and Rozhon appealed their respective benefits calculations to PepsiCo's Administration Committee in June 2004. Kannapien claimed that her Golden Grain service date should have been used in calculating both her basic benefits and the change-in-control benefits under the Retirement Plan; Rozhon challenged only the calculation of her change-in-control benefits under the Retirement Plan. In August 2004, the Administration Committee notified Kannapien and Rozhon separately, and in writing, that they were denying their appeals because: (1) Golden Grain employees did not become participants in the Quaker Retirement Plan until July 1, 1990; and (2) they had already received a retirement benefit for the preceding years—presumably the funds received pursuant

to the Golden Grain Profit Sharing Plan. The letters also noted that the dollar amounts presented to Kannapien and Rozhon in the December 2002 estimate statements were properly calculated using the appropriate July 1, 1990 date.

After their appeals were denied, Kannapien and Rozhon commenced this litigation. In granting Quaker and PepsiCo's motion for summary judgment, the district court found that (1) Kannapien and Rozhon had not sufficiently alleged an ERISA estoppel claim because they relied largely on innocent, oral misstatements and the language of the Retirement Plan is unambiguous, *Kannapien*, 433 F. Supp. 2d at 904-05; (2) Kannapien and Rozhon had not properly raised an ERISA claim for breach of fiduciary duty because the suit had not been filed against any plan fiduciaries, *id.* at 907, and (3) Kannapien and Rozhon's state-law claims were preempted by ERISA, *id.* at 908.

## II. ANALYSIS

On appeal, Kannapien and Rozhon contend that they sufficiently raised an issue of material fact on each of the counts in their complaint. We will review the district court's grant of summary judgment *de novo*, viewing all facts in the light most favorable to the plaintiffs. *See Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 870 (7th Cir. 2006); *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004). While we have recently recognized that the "clearly erroneous" standard of review applies in an ERISA case if the summary judgment motion deals solely with the characterization of facts and neither party claims the right to a jury trial, the general standard of *de novo* review applies in this case. *See McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 575-76 (7th Cir. 2007). Summary judgment is proper when "there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A. ERISA Estoppel Claims

Kannapien and Rozhon's first claim is for ERISA estoppel under 29 U.S.C. § 1132(a)(3). Kannapien and Rozhon concede that they have been paid benefits according to the written terms of the Retirement Plan; however, they seek to estop Quaker and PepsiCo from enforcing the express terms of the Plan because they allege that they detrimentally relied upon misstatements by Quaker employees in their decisions to retire. We agree with the district court that Kannapien and Rozhon do not raise any genuine issue of material fact with respect to their ERISA estoppel claim.

The written plan document ordinarily governs ERISA plan administration; statements or conduct by individuals implementing the plan can only estop an employer from enforcing the plan's written terms in "extreme circumstances." *Vallone*, 375 F.3d at 639; *Sandstrom v. Cultor Food Sci., Inc.*, 214 F.3d 795, 797 (7th Cir. 2000); *see also Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000). We have consistently required that modifications to an ERISA plan must be in writing because ERISA exists, in part, to protect the financial integrity of pension and welfare plans by confining the payment of benefits to a plan's written terms. *See Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 650 (7th Cir. 2001); *Downs*, 214 F.3d at 805. As a result, in order to prevail on an estoppel claim under ERISA, we ordinarily require that plaintiffs show: (1) a knowing misrepresentation; (2) made in writing; (3) reasonable reliance on that representation by them; (4) to their detriment. *Vallone*, 375 F.3d at 639; *Coker v.*

*Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999). Here, we see no basis upon which to grant estoppel to Kannapien and Rozhon as they fail to satisfy any required element of an ERISA estoppel claim.

First, Kannapien and Rozhon cannot prove that any Quaker employee knowingly misrepresented the terms of the Retirement Plan to them. *See Brosted v. Unum Life Ins. Co. of America*, 421 F.3d 459, 465 (7th Cir. 2005). The December 2002 estimate statements did not contain any knowing misrepresentations. These statements inadvertently listed Kannapien's and Rozhon's respective hire dates; however, the district court determined that the record clearly established that these mistakes were solely clerical errors and not knowing misrepresentations. The record supports this conclusion because the written statements accurately reflected the dollar amounts that Kannapien and Rozhon would receive under the written terms of the Retirement Plan. At any rate, Kannapien and Rozhon concede that these clerical errors in the estimate statements were unintentional.

Further, the representations made to Kannapien and Rozhon by their Human Resources Manager, Satterlee—that their Golden Grain hire dates would be used in calculating their change-in-control benefits—were the product of an innocent mistake, not a knowing misrepresentation. Indeed, the record contains ample evidence to support this as well. Specifically, Satterlee advised both Kannapien and Rozhon to consult the Employee Administration Center to obtain benefits estimates after telling them that he could not individually compute their benefits. Satterlee also sought to rectify his misinformation by contacting the Employee Administration Center on their behalf once he discovered his error. Kannapien and Rozhon also conceded in their depositions that they believed Satterlee made an honest mistake.

Finally, Winters's statement to Kannapien that she "would be pleased" if she considered taking early retirement does not constitute a knowing misrepresentation. In fact, we agree with the district court that this statement does not misrepresent anything about the terms of the Retirement Plan, *see Kannapien*, 433 F. Supp. 2d at 902 n.5, nor does it represent anything at all because this forward-looking statement was not a statement of fact, *see Frahm v. Equitable Life Assur. Soc. of U.S.*, 137 F.3d 955, 961 (7th Cir. 1998).

Likewise, Kannapien and Rozhon cannot point to any written misrepresentation by Quaker or PepsiCo. Oral misrepresentations may become grounds for ERISA estoppel only where plan documents are ambiguous or misleading. *Vallone*, 375 F.3d at 639; *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 587-90 (7th Cir. 2000); *cf. Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 784 (7th Cir. 2005) (approving use of extrinsic evidence to prove the meaning of language in ERISA welfare plan documents "only if the language of the plan document is ambiguous and the ambiguities are not clarified elsewhere in the document").

Here, both parties concede that the written terms of the Quaker Retirement Plan unambiguously stipulate that Kannapien's and Rozhon's credited service began on July 1, 1990, the date they became participants in the Plan. In light of the Retirement Plan's clear language, Kannapien and Rozhon must present a *written* misrepresentation to trigger estoppel. *See Bowerman*, 226 F.3d at 588 ("We have made clear in our earlier cases that the oral representations of an ERISA plan may not be relied upon by a plan participant when the representation is contrary to the written terms of the plan and those terms are set forth clearly."). In their brief and at oral argument, Kannapien and Rozhon focused almost exclusively on the oral statements made to them by Satterlee and Winters.

Even if we agreed that these oral statements were misrepresentations (which we do not), they are insufficient grounds for estoppel. *See id.*

The only alleged written misrepresentations Kannapien and Rozhon cite are contained in the December 2002 estimate statements and in the Employee Administration Center documents provided to them by Satterlee in early 2003. But as we have already explained, these estimate statements merely contained a clerical error; they did not misrepresent the actual amounts that Kannapien and Rozhon were entitled to under the Retirement Plan. Beyond this, the estimate statements contained disclaimers that expressly stated that, in the event of a conflict, the written terms of the Retirement Plan would govern. Similarly, the Employee Administration Center documentation did not contain any misrepresentations. These materials accurately explained that the change-in-control benefits would be paid out of the Retirement Plan. Although the Employee Administration Center documents left the term "years of service" undefined, it made reference to the Plan, which defines the term consistently throughout. Kannapien and Rozhon have not presented evidence of any inaccuracies in the Employee Administration Center documentation.

In an attempt to distinguish our precedent and evade the first two requirements of an ERISA estoppel claim, Kannapien and Rozhon rely heavily on our decision in *Bowerman v. Wal-Mart Stores*, where we applied estoppel based on innocent oral misrepresentations; however, a brief examination makes it clear that *Bowerman* is inapposite. *See id.* In *Bowerman*, we applied ERISA estoppel to Wal-Mart because its written health plan contained ambiguous provisions, and its employees made repeated incorrect statements that misled Bowerman into declining additional coverage provided under federal law. *See id.* Had Bowerman elected the additional cover-

age, she would have been entitled to medical expenses for a pre-existing condition upon her return to Wal-Mart. *See id*.

Three distinctions between this case and *Bowerman* are immediately apparent. First, and most critically, the written plan at issue in *Bowerman* contained ambiguous language, while it is conceded here that the Quaker Plan is unambiguous. Second, the plaintiff in *Bowerman* detrimentally relied on statements by employees, and her reliance deprived her of benefits that she would have been eligible for *under the terms of the plan* had she made the additional-coverage election; here, it is uncontested that Kannapien and Rozhon received the full benefits to which the written terms of the Retirement Plan entitled them, regardless of any alleged reliance. Third, *Bowerman* concerned an employee health plan, while the instant case concerns a pension plan. *See Helfrich v. Carle Clinic Ass'n*, 328 F.3d 915, 918 (7th Cir. 2003) (stating that unlike welfare benefits plans, ERISA requires pension plans to be very formal). We therefore see no reason to depart from the traditional rubric we use to evaluate the sufficiency of an ERISA estoppel set forth in *Vallone*. *See* 375 F.3d at 639.

Moreover, there is no evidence in the record of any reliance—detrimental or otherwise—by Kannapien or Rozhon either on the December 2002 estimate statements or on the Employee Administration Center documents in making their decisions to retire. In fact, Kannapien and Rozhon each acknowledged at separate depositions that the benefits under the Severance Plan, which were properly paid and are not at issue in this case, significantly motivated her decision to retire; each also admitted that she relied on the honest mistake conveyed to her orally by Satterlee. These admissions, even taking all facts in the light most favorable to Kannapien and

Rozhon, make it impossible for either to prove that she relied on any written statement to provided to her by Quaker. *See Sides*, 496 F.3d at 822.

Kannapien and Rozhon further attempt to extricate themselves from the requisite elements of ERISA estoppel by arguing that they have not asserted their estoppel claims against the ERISA plan itself, but instead have raised an estoppel claim against Quaker and PepsiCo directly. Thus, they assert that they may estop Quaker and PepsiCo based upon honest, oral misstatements. We find this argument unavailing.

In their briefs and at oral argument, counsel for Kannapien and Rozhon characterized the benefits to which they were entitled as part of a "one-time-only-offer." This characterization by counsel conflated the change-in-control benefits paid out of the Retirement Plan with the benefits his clients already received under the Severance Plan. But it is clear from the record that the Severance Plan benefits have been paid in full and that they are not in dispute in this case. In fact, Kannapien and Rozhon have never challenged the calculation of those benefits—not even in their internal appeals to the PepsiCo Administration Committee. Contrary to counsel's suggestion, the benefits that Kannapien and Rozhon seek in this case are change-in-control benefits that must be paid out of the Retirement Plan, a pension plan under ERISA, and we have noted that when a plaintiff seeks to recover benefits under an ERISA Plan, such claims must be asserted against the plan and not against the employer. *See Helfrich*, 328 F.3d at 917 ("Claims based on the plan . . . must be enforced against the plan . . . ."). Kannapien and Rozhon do not cite any authority for their attempted circumvention of our clear view that estoppel claims based upon alleged oral misrepresentations cannot succeed when asserted against an unambiguous,

non-misleading ERISA pension plan. *See Bowerman*, 226 F.3d at 588.[1]

Kannapien and Rozhon make one further argument. They argue that Quaker should not be allowed to enforce the written terms of the Retirement Plan because Quaker allegedly disregarded the plan's express language by offering Kannapien and Rozhon, who retired voluntarily, benefits that are reserved for "involuntary terminations" under the Retirement Plan. We agree with the district court that this argument is unpersuasive. *Kannapien*, 433 F. Supp. 2d at 906. First, it is not clear that Quaker has deviated from the written terms of the Retirement Plan, as the term "involuntary termination" is not defined in the Retirement Plan. More importantly, Kannapien and Rozhon benefitted from Quaker's departure from formalism: they received extra pay under the Severance Plan and extra money from the change-in-control benefits that they would not have been entitled to under the Retirement Plan's written terms. Kannapien and Rozhon cannot appeal to equity to obtain more than the written language of the Retirement Plan allows. *See Shields v. Local 705, Intern. Bhd. of Teamsters Pension Plan*, 188 F.3d 895, 905 (7th Cir. 1999) (Posner, J., concurring).

Because the Retirement Plan unambiguously defines "credited service" as commencing on July 1, 1990 for both women, and because neither Kannapien nor Rozhon can

---

[1] We pause here to note that this tactic attempts to substitute state-law estoppel principles for the ERISA framework. Such a tactic, if allowed, could raise serious questions with respect to ERISA's preemption of state law. *See* 29 U.S.C. § 1144(a). It could also raise doubts as to subject-matter jurisdiction in this case, where all parties are residents of Illinois and jurisdiction is based solely on federal questions arising under ERISA. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1332; 29 U.S.C. § 1132(a)(3).

prove that she relied on any knowing written misrepresentation by Quaker, we hold that there was no issue of material fact on the ERISA estoppel claim and that the district court properly held that Quaker and Pepsico were entitled to summary judgment as a matter of law.

## B.  ERISA Fiduciary Duty Claim

Next, Kannapien and Rozhon present ERISA claims for breach of fiduciary duty, also under 29 U.S.C. § 1132(a)(3). In order to prevail on a claim for breach of fiduciary duty under ERISA, a plaintiff must prove (1) that defendants are plan fiduciaries; (2) that defendants breached their fiduciary duties; and (3) that their breach caused harm to the plaintiffs. *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006); *Brosted*, 421 F.3d at 465. An ERISA plan fiduciary does not breach its fiduciary duties under ERISA by merely providing negligent misinformation about the contours of a Plan. *See Vallone*, 375 F.3d at 642*; Frahm*, 137 F.3d at 955.

Neither Satterlee nor Winters is a plan fiduciary under § 3(21)(A) of ERISA. *See* 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."). Clearly, Satterlee and Winters do not fit this statutory definition: nothing in the record suggests that either had any managerial, investment, or discretionary role in the Quaker Retirement Plan.

The only cognizable fiduciaries from the record are members of the PepsiCo Administration Committee and Employee Administration Center that served as Plan administrators. However, Kannapien and Rozhon have not sued either Committee or any of their constituent members. Moreover, there is no allegation that Quaker or PepsiCo intended to deceive Kannapien or Rozhon. Indeed, the only misinformation provided to Kannapien and Rozhon by the Plan administrators was contained in the December 2002 estimate statement that erroneously referenced Kannapien's and Rozhon's hire dates, but Kannapien and Rozhon concede that this mistake was merely a clerical error and therefore unintentional.

Additionally, Kannapien and Rozhon suggest that the misinformation provided to them by Satterlee may be attributed to the Plan administrators. Even looking past the fact that the administrators are not a party to this suit, there is no precedent for this approach. Finding that Plan administrators may breach a fiduciary duty vicariously through the actions of a non-fiduciary would vitiate our requirement that an ERISA claim for breach of a fiduciary duty must be asserted against plan fiduciaries. *See Jenkins*, 444 F.3d at 924; *Bowerman*, 226 F.3d at 590-91. In any event, there is no evidence that Satterlee intended to deceive Kannapien or Rozhon. His mistake was honest, as we have previously explained.

### C.  State-Law Claims

Lastly, we turn to the claims under Illinois state law that Kannapien and Rozhon added to the final version of their complaint. These claims have no merit. Section 514(a) of ERISA states that ERISA supersedes "any and all State laws" that relate to "any employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court has consistently reminded us that ERISA's preemption of state laws as

enunciated in § 514(a) is "clearly expansive," *see Egelhoff v. Egelhoff ex. rel. Breiner*, 532 U.S. 141, 146 (2001), and we have likewise interpreted the provision broadly, *see Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 128 (7th Cir. 1992). Because of this statutory scheme, "[a] suit to enforce a claim for benefits under an ERISA plan can be brought only under ERISA; parallel state law remedies are preempted." *Rud v. Liberty Life Assur. Co. of Boston*, 438 F.3d 772, 777-78 (7th Cir. 2006) (citing *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 392 (2002)). With their Illinois contract and promissory estoppel claims, Kannapien and Rozhon pursue benefits to be paid from the ERISA Retirement Plan; therefore their state-law claims are preempted.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*